IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

COURTHOUSE NEWS SERVICE,

      Plaintiffs,

vs.                                                    No. CIV 21-0710 JB/LF

NEW MEXICO ADMINISTRATIVE
OFFICE OF THE COURTS;
ADMINISTRATIVE OFFICE DIRECTOR
ARTHUR W. PEPIN; NEW MEXICO FIRST
JUDICIAL DISTRICT COURT CLERK'S
OFFICE and the FIRST JUDICIAL COURT
CLERK KATHLEEN VIGIL,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on the Plaintiff Courthouse New Service's

Motion for Preliminary Injunction, filed July 30, 2021 (Doc. 2)("PI Motion"). The Court held a

hearing on the PI Motion on September 28, 2021. <u>See</u> Clerk's Minutes, filed September 28, 2021

(Doc. 29). The primary issues are whether: (i) the Court should abstain from adjudicating this case

under <u>Younger v. Harris</u>, 401 U.S. 37 (1971); (ii) the Plaintiff Courthouse News Service

("Courthouse News") has a right under the First Amendment to the Constitution of the United

States of America to access non-confidential civil complaints; (ii) if there is such a right, (a) when

it attaches, (b) what is its scope, (c) what level of scrutiny is appropriate; (iv) whether the

Defendants have likely violated Courthouse News' First Amendment right of timely access; and

(v) whether the Courthouse News is entitled to a preliminary injunction ("PI") to prevent the

Defendants from continuing to violate Courthouse News' rights. The Court concludes that: (i) the

Court will not abstain under <u>Younger</u>, because an injunction would not interfere with an ongoing

state proceeding; (ii) there is a qualified right of timely access to civil complaints which (a) attaches upon submission of a complaint, (b) is defined in light of traditional access times, (c) is subject to "more relaxed" or "rigorous" scrutiny; (iv) by not always allowing Courthouse News to access newly filed civil complaints within five business hours after their submission, the Defendants have violated Courthouse News's First Amendment right of timely access as defined by traditional access standards; (v) Courthouse News is entitled to a preliminary injunction enjoining the Defendants from disallowing press or public access to newly filed non-confidential civil complaints for longer than five business hours, but is not entitled to a preliminary injunction which gives them pre-processing, on-receipt, or immediate access to newly filed non-confidential civil complaints; and (vi) Courthouse News will not be required to secure a bond.  The Court, therefore, grants in part and denies in part Courthouse News' request for a PI.

## FINDINGS OF FACT

"'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.)(quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only).  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.");  Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union  No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).  The United States Court of Appeals for the Tenth Circuit notes that "when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits."  Heideman v. S. Salt

Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d at 1188.  Thus, while the Court does the best it can to make findings from the record that it has and in the short time that it has to make findings, these findings of fact are only to determine whether to issue a PI.  These facts do not bind the Court or the parties at trial.  Accordingly, the Court finds as follows:

      1.      **The Parties.**

      1.      Courthouse News is a California corporation with its principal place of business located in Pasadena, California.  See Plaintiff's Original Complaint for Preliminary and Permanent Injunctive and Declaratory Relief ¶ 8, at 3, filed July 30, 2021 (Doc. 1)("Complaint").

      2.      Courthouse News "is a nationwide news service founded almost 30 years ago," which "employs approximately 240 people, most of them editors and reporters, covering state and federal trial and appellate courts in all 50 states in the United States."  Complaint ¶ 8, at 3.

      3.      Courthouse News has "more than 2300 subscribers nationwide," including the Associated Press and The Wall Street Journal.  Complaint ¶ 15, at 6.

      4.      Courthouse News "publishes a free public website, featuring news reports and commentary" at www.courthousenews.com.  Complaint ¶ 12, at 5.

      5.      Courthouse News covers "new civil cases, general jurisdiction cases against any business or public entities primarily," but does not "cover domestic or criminal or probate [cases]," nor does it "cover cases against only individuals."  Transcript of Hearing at 6:20-7:2 (Girdner)(taken September 28, 2021) filed October 5, 2021 (Doc. 28)("Tr.").

      6.      Courthouse News publishes the "Daily Brief," a "subscription-based report on appellate rulings and select trial court rulings throughout the nation."  Complaint ¶ 13, at 5.

7.     In addition, Courthouse News publishes "subscription-based reports on new civil actions called 'new litigation reports,'" which contain "staff-written summaries of significant new civil complaints, and are sent to subscribers via email each evening."  Complaint ¶ 13, at 5.

8.     Courthouse News has a new, subscription-based litigation report for New Mexico called, the "New Mexico Report," which covers civil complaints filed in the United States District Court for the District of New Mexico, "in addition to civil complaints filed in the county district courts of New Mexico."  Complaint ¶ 13, at 5.

9.     Litigation reports such as the "New Mexico Report" "primarily cover new civil complaints filed against business institutions and public entities," and do not cover family law, probate, or criminal matters.  Complaint ¶ 17 at 6.

10.    Courthouse News does not review sealed complaints or those filed in non-public categories.  Complaint ¶ 17 at 6.

11.    Courthouse News has been reporting on new civil complaints filed in New Mexico "since 2005, when it began covering the U.S. District Court in New Mexico and the state district courts in Santa Fe and Albuquerque."  Complaint ¶ 18, at 7.

12.    William Girdner is the publisher of Courthouse News.  See Declaration of William Girdner in Support of Plaintiff Courthouse News Service's Motion for Preliminary Injunction at 1, filed July 30, 2021 (Doc. 2-2)("Girdner Decl.").

13.    Defendant New Mexico Administrative Office of the Courts ("NMAOC") is a branch of the New Mexico court system that "exists to enable the courts of New Mexico to accomplish their mission through":

- Ensuring that the courts have adequate, equitably distributed resources

- Ensuring that the courts have and use current technology

- 4 -

- Providing a fair and equitable statewide human resources system

- Developing and implementing improved court processes and supporting courts in their use

- Collecting and providing information on and for the courts

- Managing and accounting for the collection of revenue

- Ensuring sound financial, budgeting and procurement practices in the management of court resources

- Providing administrative support for the magistrate courts

- Maintaining liaison with the legislative and executive branches of state government

Administrative Office of the Courts, AOC, available at   https://www.nmcourts.gov/court-administration/administrative-office-of-the-courts-aoc/.  See Complaint ¶ 9 at 4.

14.    Defendant Arthur Pepin is the Director of NMAOC.  See Complaint ¶ 9, at 4.

15.    Defendant New Mexico First Judicial District Court Clerk's Office ("Clerk's Office") "is the processing center through which virtually all the court and case documents flow." Complaint ¶ 11, at 4 (quoting First Judicial District Court, Court Clerk's Office, available at https://firstdistrictcourt.nmcourts.gov/home/court-clerks-office/).

16.    Defendant Kathleen Vigil is the First Judicial District Court Clerk ("Court Clerk"). See Complaint ¶ 11, at 4.

17.    The Judicial Information Division ("JID") is a branch of the NMAOC responsible for the electronic filing system ("e-filing").  See Tr. at 103:17-104:11.

18.     The Judicial Technical Counsel ("JTECH") is the statewide technology council, formerly known as "JIFFY."  Tr. at 104:17-105:21; Judicial Technical Counsel (JTech), available at https://www.nmcourts.gov/court-administration/judicial-information-systems-council-jiffy/.

19.     The Online Access Subcommittee ("OAS") is an advisory committee to JTECH. See Tr. 106: 19-23; Online Access Subcommittee (OAS), available at https://www.nmcourts.gov/court-administration/online-access-subcommittee-oas/.

**2.     New Mexico Courts' Paper Filing System Before 2012.**

20.      Before 2012, New Mexico courts used a paper filing system for court records. See Complaint ¶ 20, at 7; Girdner Decl. ¶ 12, at 5.

21.     When the New Mexico courts used a paper filing system, Courthouse News reporters would go "in person to those courts" to "review[] new paper complaints."  Complaint ¶ 18, at 7.

22.     Until around 2011, Courthouse News reporters were "allowed behind the counter to review new civil complaints on the day they were filed in Bernalillo, Santa Fe, Sandoval and Valencia counties."  Girdner Decl. ¶ 12, at 5.

23.     Before the advent of e-filing in New Mexico, paper (or "manual") filing "was essentially a two-step process."  Declaration of Judge James Noel, ¶ 5 at 3, filed September 7, 2021 (Doc. 19-1)("Noel Decl.").

24.     "An attorney or runner would bring an original paper pleading to the respective state court during regular business hours, M-F 8:00am to 5:00pm, hand it to the clerk who would review it for completeness, and then the clerk would either file it with a hand stamp, or reject it on the spot."  Noel Decl. ¶ 5, at 3.

25.     "If filed, a copy of that filing would be placed in a box (literally) that [Courthouse News] would review daily."  Noel Decl. ¶ 5, at 3.

26.      "By virtue of this box of paper filings, [Courthouse News] essentially had same-day access to non-sealed, filed case records."  Noel Decl. ¶ 5, at 3.

27.     "If a submission was rejected by a clerk however, it would be handed back to the attorney or runner on the spot (not placed in [Courthouse News'] box), who might return the same day or the next business day with a corrected version of the pleading (or in some cases, not even refile the document)."  Noel Decl. ¶ 5, at 3.

28.      "The file date reflected the date the pleading was submitted and accepted for filing. In the case of the rejected manual submission, if it was rejected late Friday afternoon, a corrected submission would most likely not make it back to the clerk's office until Monday for filing."  Noel Decl. ¶ 5, at 3.

29.     "As a result, it carried the Monday filing date, not the Friday filing date."  Noel Decl. ¶ 5, at 3.

30.     "Traditionally, the intake clerk, when he or she pulled in a civil complaint, put it in a box next to him or her.  That was true in federal court and state court.  And Judge Noel's declaration quite accurately describes that box."  Tr. at 7:17-22 (Girdner).

31.     Before the e-filing system, an attorney or a runner would have only been able to file pleadings during regular business hours, so that, for example, an "attorney would not have been able to submit a document for filing at 5:15pm on the Wednesday before Thanksgiving."  Noel Decl. ¶ 9, at 5.

32.     "Instead, that document would not have been presented for filing until the following Monday morning, at which point, assuming it is without error and is filed into the record, it would have been dropped into [Courthouse News'] box for their review."  Noel Declaration ¶ 9, at 5.

33.     Courthouse News reporter Victoria Prieskop described the process of reviewing new civil complaints filed before the e-filing system was implemented in New Mexico:

        a.   "Every courthouse would be a little different, but I would approach the clerk's

- 7 -

desk.  I would get the attention of the clerk, and they would let me in behind the desk to the work area behind the desk."  Tr. at 52:22-53:1 (Prieskop).

b.  "And then there would be either a stack or a rack or some other holding receptacle of cases that had been received but not yet docketed, and then also of cases had been docketed but not yet filed into the record."  Tr. at 53:1-5 (Prieskop).

c.  "I would go through both the docketed cases and the cases that had been received but not yet fully processed . . . [and] I'd record them into our system."  Tr. at 53:5-8 (Prieskop).

34.    "[H]ow long would it take the clerk to perform [the] very first initial review of the complaint?" Tr. at 54:10-12 (Edwards), "It wasn't something I spent a great deal of time observing, but I would say a minute to two minutes at most," Tr. at 54:13-15 (Prisekop).

        **3.     New Mexico's Change to E-Filing.**

35.    New Mexico began transitioning to e-filing in 2012, and it became mandatory in 2014.  See Girdner Decl. ¶¶ 12-13, at 5; Tr. at 52:16-17 (Prieskop).

36.    The Court notes the definitions of the following terminology:

a.  The Odyssey Case Management System is "the electronic case management system used by [NMAOC] and New Mexico courts."  Noel Decl. ¶ 3, at 2.

b.  Odyssey File & Serve is "the electronic e-filing system used by attorneys to electronically file their pleadings in New Mexico state courts."  Noel Decl. ¶ 3, at 2.

c.  Secure Odyssey Public Access ("SOPA") refers to the online access given at

different levels to different parties, not all of which is public.  See Noel Decl. ¶

3, at 2 & n. 1.

      d.   Case Lookup is the "general access to docket information available to anyone"

and is located at https://caselookup.nmcourts.gov/caselookup/app.  Noel Decl.

¶ 3, at 2.

37.    The NMAOC uses Odyssey File & Serve software for its e-filing system.  See

Defendants' Response to Plaintiff's Motion for Preliminary Injunction at 6, filed September 7,

2021 (Doc. 19)("Response").

38.    The NMAOC entered into a contract with Tyler Technologies, Inc., on June 15,

2018.  See re:SearchNM Agreement at 8 (dated June 15, 2018)(admitted at Preliminary Injunction

Hearing on September 28, 2021, as Plaintiff's Exhibit 4)("Tyler Agreement").

39.    The Tyler Agreement states that:

> re:SearchNM will vest in the central registry of eFileNM and maintain a registry
> that uniquely identifies users, authenticates their sign-on to re:SearchNM, and
> applies the appropriate security policy to provide access to court documents and
> information.  The integration of accounts for eFileNM, re:Search, and New
> Mexico's Secured Odyssey Public Access (SOPA) will be seamless to the external
> user.

Tyler Agreement at 9.

40.    Tyler Technologies provides different levels ("tiers") of access to SOPA to, for

example, attorneys of record, self-represented litigants, members of the press, State auditors, staff

attorneys, law enforcement personnel, and system administrators.  Tyler Agreement at 10-11.

41.    Tyler Technologies provides five tiers of access: Attorney of Record, Tier 1, Tier

2, Tier 3, and SuperSOPA.  See Tyler Agreement at 14.

42.    Members of the "press are able to access 'Tier One' files, which include the non-

confidential civil cases at issue here." Noel Decl. ¶ 3, at 2.

43.    "An application for SOPA access is required, but SOPA access is free." Noel Decl. ¶ 3, at 2.

    **4.**    **How New Mexico's Current E-Filing System Works.**

44.    In New Mexico, e-filing is mandatory for attorneys, who are "required to redact any protected personal identifying information (PPII) contained within the pleadings," in accordance with rule 1-079(D) NMRA.  Response at 7.

45.    Laura Orchard has been a senior IT project manager for NMAOC's Judicial Information Division ("JID") for "[a] little over five-and- a-half years."  Tr. at 73:23-74:3 (Orchard).

46.     A document that is submitted by an attorney through the Odyssey system goes through five phases: (i) the draft phase; (ii) the submitted phase; (iii) the under review phase; (iv) the processing phase; and (v) accepted/transmitted phase.  See Tr. 77:11-81:10 (Orchard).

47.    The above terms are derived from "Tyler's File and Serve" application, which NMAOC uses.  Tr. at 88:1-3 (Orchard).

48.    In the first, "draft phase," an

    a.  "attorney filer is using a[]  . . .  File and Serve application to enter . . . the case type, the parties involved in the case, and they pick the location for where the case is going to be filed."  Tr. at 77:11-23 (Orchard).

    b.  "Then they upload their pleading documents into what File and Serve refers to as an electronic envelope."  Tr. at 77:18-19 (Orchard).

    c.  "And all of that is compiled into that single envelope, and then the filer presses the submit button."  Tr. at 77:20-22 (Orchard).

49.    In the second, "submitted" phase,

    a.  "[O]nce the filer hits the submit button, that envelope lands in a Tyler Technologies server."  Tr. at 78:2-4 (Orchard).

    b.  "And it is sorted into queues based on the location that the filer selected when they were creating their envelope."  Tr. at 78:4-6 (Orchard).

    c.  "So that envelope sits there in that queue until the court clerk goes into the  File and Serve review queue and opens the envelope."  Tr. at 78:6-8 (Orchard).

50.    In the third, "under review" phase,

    a.  "once the clerk opens the envelope, the status of that envelope now becomes under review."  Tr. at 68:9-10 (Orchard).

    b.  "So it went from draft to submitting to submitted to under review.  So as the clerk reviews the contents of the envelope, they look at all of the data that was entered by the filer, including the party information and the case type that they chose." Tr. at  78:10-16 (Orchard).

    c.  "And they review each of the documents for completeness, for signatures, for the quality of the scan, that sort of thing."  Tr. at 78:16-19 (Orchard).

    d.  "They add some annotations in some cases."  Tr. at 78:19-20 (Orchard).

    e.  "They add their signatures in some cases."  Tr. at 78:20 (Orchard).

    f.  "And they basically look through however many documents have been included in that envelope."  Tr. at 78:20-22 (Orchard).

    g.  "They look through each one."  Tr. at 78:22-23 (Orchard).

    h.  "And for each one of those documents there is a filing code attached."  Tr. at 78:24-25 (Orchard).

     i.   "So if there is a filing code and a document attached, the reviewer has to click the accept button for each one."  Tr. at 78:25-79:1 (Orchard).

51.    Clerks "review documents for legibility, completeness, for confidentiality,"  Tr. at 199:3-5 (Baca), and ensure "the correct category was selected, the correct case type was selected," Tr. at 199:5-8 (Baca).

52.    Clerks "review for confidential information," and "make sure nothing is included that should be sealed, such as maybe medical records, financial statements, evaluations, and stuff of that nature."  Tr. at 200:18-22 (Baca).

53.    In the fourth, "processing" phase,

     a.   "a number of things happen. . . .  it appears, because it happens so quickly . . .  it appears that it happens simultaneously, but there is actually a sequence to it."  Tr. at 79:13-16 (Orchard).

     b.   "The first step in that is that the credit card payment is processed to the bank."  Tr. at 79:16-18 (Orchard).

     c.   "Now, if that fails, the envelope still in the processing status gets thrown into an error filings queue."  Tr. at 79:19-21 (Orchard).

     d.   "And there is nothing the court can do if a credit card fails, so they have to return that envelope back to the filer, and nothing happens with that envelope until the filer fixes whatever was wrong."  Tr. at 79:21-25 (Orchard).

     e.   "If the payment processes correctly, then the next thing that happens is that data is sent to Odyssey from File and Serve."  Tr. at 80:1-3 (Orchard).

     f.   "Odyssey generates a new case and applies a new case number to it, assigns a judge to it, and gives it a case style, so the title of the case."  Tr. at 80:3-6

(Orchard).

g.  "That information, once it's generated in Odyssey goes back to File and Serve, and it populates all of the pleading documents where there were token fields waiting for that case number or the judge assignment, waiting for that judge's name, and all of that information populates the documents and it populates an e-notification."  Tr. at 80:7-13 (Orchard).

h.  "So once all of that information is burned into the documents, those documents get  transmitted -- and I'm using the word 'transmitted' because that's a File and Serve term."  Tr. at 80:14-17 (Orchard).

i.  "It gets transmitted to Odyssey, and now the status is called 'Accepted.'"  Tr. at 80:17-19 (Orchard).

54.     In the fifth, "accepted/transmitted" phase,

a.  "once the status changes to accepted, the case is complete in Odyssey."  Tr. at 80:19-20 (Orchard).

b.  "And the e-notification is sent back to the filer, any service contacts and any courtesy copy folks who were added by that filer in that envelope."  Tr. at 80:20-23 (Orchard).

c.  "[T]hen once the case [is] complete[d] in Odyssey and it's in the accepted status, it immediately is mirrored out to the public through the Secured Odyssey Public Access site."  Tr. at 80:24-81:3 (Orchard).

d.  "And then a publisher['s] job is run momentarily after the case is completed."  Tr. at 81:3-4 (Orchard).

e.  "And that gets the information updated to the re:Search NM site."  Tr. at 81:4-5

(Orchard).

 f. "So the first site where it's available is what we called SOPA, the Secured Odyssey Public Access site."  Tr. at 81:5-7 (Orchard).

 g. "The second site where it's available is re:Search NM."  Tr. at 81:7-8 (Orchard).

 h. "And then there is an overnight job run for the Case Lookup site."  Tr. at 81:8-10 (Orchard).

55. "If the filing is rejected, a notice is immediately sent back to the filer with an explanation as to why the submission could not be filed."  Noel Decl. ¶ 6, at 4.

56. "[I]f the submission is accepted [. . .] an event publisher notification is immediately sent to the filer with a link to the filed record, and the filed record appears in Odyssey immediately."  Noel Decl. ¶ 6, at 4.

57. "Odyssey is constantly syncing with SOPA, so that as new submissions are filed, they are also almost immediately seen in SOPA as well."  Noel Decl. ¶ 6, at 4.

58. "[T]here is some delay with the filing event appearing in Case Lookup."  Noel Decl. ¶ 7, at 4.

59. "Case Lookup does not provide access to records, but it does provide a register of actions, which includes filing events."  Noel Decl. ¶ 7, at 4.

60. "At the end of each day, events that occurred throughout the day are batched and then uploaded into Case Lookup overnight."  Noel Decl. ¶ 7, at 4.

61. "During the work week, there is a 24-hour delay in filing events appearing in Case Lookup."  Noel Decl. ¶ 7, at 4.

62. Once a file is "considered transmitted to Odyssey, and it has the accepted status, that's when it's considered [by New Mexico to be] in the possession of the court."  Tr. at 81:17-20

(Orchard).

63.     Instead of using the word "filed," the NMAOC distinguishes between when a document is "submitted" and when it is "transmitted" or "accepted."  Tr. at 81:15-20 (Orchard); id. at 82:4-5 (Orchard).

64.     "Immediately upon acceptance, [a] pleading is available to the press, who has access through SOPA."  Noel Decl. ¶ 15, at 7.

65.     "[T]here is no delay between acceptance and viewing by the press as long as press have a free account to view accepted pleadings in SOPA."  Noel Decl. ¶ 15, at 7.

66.     Tyler Technologies is able to track the time between a document's submission and its transmission or acceptance:

>   a.   "Tyler Technologies has a system-generated report out of File and Serve that tracks from the moment the filer clicks the submit button."  Tr. at 82:1-4 (Orchard).
>
>   b.   "So that's called the submitted date and time that ends up being indicated on the file stamp on the document."  Tr. at 82:4-6 (Orchard).
>
>   c.   "So it tracks from the submitted time to the transmitted time into Odyssey."  Tr. at 82:6-7 (Orchard).

67.     Odyssey's File and Serve system allows attorneys to file pleadings twenty-four hours a day, seven days a week.  See Tr. at 85:4-8 (Orchard).

**5.      Filing Statistics for the Current e-Filing System.**

68.     Between July 26, 2021, and August 25, 2021, 93.05 percent -- 2,102 of 2,259 -- of Statewide Civil District initial filings were accepted by the court within twenty-four hours, see Defendants' Summary Table (dated September 28,  2021)(admitted at Preliminary Injunction

Hearing on September 28, 2021, as Defendants' Exhibit B), and 65.56 percent -- 1,481 of 2,259 -- were accepted on the same date as submission, see Defendants' Summary Table; Defendants' Raw Data (dated September 28, 2021)(admitted at Preliminary Injunction Hearing on September 28, 2021, as Defendant's Exhibit C); Tr. at 96:7-13.

69.     Between February 23, 2021, and June 30, 2021, 69.47 percent of cases -- 5,330 out of 7,672 -- filed in New Mexico district courts were accepted and available to the press the same business day as they were submitted.[1]   See NM District Court Media Access Log 2/23/21 to 6/30/21 at 1, filed July 30, 2021 (Doc. 2-3)("February to June Log").

70.     For the same time period, 24.30 percent were accepted the following day, while 2.31 percent had a two-day delay, and 3.92 percent had a delay of three days or more.   See February to June Log at 1.

71.     Between July 1, 2021, and September 17, 2021, 70.46 percent of cases -- 2734 out of 3880 -- filed in New Mexico district courts were accepted the same day as they were submitted.[2]   See NM District Court Media Access Log 7/1/21-9/17/21 at 1 (admitted at Preliminary Injunction Hearing on September 28, 2021, as Plaintiff's Exhibit 5)("July to September Log").

72.     For the same time period, 27.22 percent were accepted the next day, while 2.06 percent had two days' delay, and 0.26 percent had a delay of three days or more.   See July to September Log at 1.

73.     Between July 1, 2021, and September 17, 2021, 43.25 percent of cases -- 157 out

---

[1]Unlike the Defendants' data, Courthouse News' data does not show the percentage of cases accepted within twenty-four hours.   See February to June Log at 1.

[2]Courthouse News' data does not show the percentage of cases accepted within twenty-four hours.   See July to September Log at 1.

of 363 -- that were filed in the Santa Fe District Court were accepted the same day, while 47.11

percent were accepted the next day.[3]  See Santa Fe District Court Media Access Log 7/1/21 to

9/17/21 at 1 (dated September 28, 2021)(admitted at Preliminary Injunction Hearing on September

28, 2021, as Plaintiff's Exhibit 6)("Santa Fe Log").[4]

74.     Between January 1, 2021, and June 30, 2021, the average number of days for a case

to go from submission to acceptance in the New Mexico courts was less than one day.[5]  See

Docketing  Currentcy  Report  at  25,  filed  September  7,  2021  (Doc.  19-1)("2021  Docketing

---

[3] Courthouse News' data does not show the percentage of cases accepted within twenty-four hours.  See Santa Fe Log at 1.

[4] Neither Courthouse News' data nor the Defendants' data shows what percentage of cases were submitted between 5:00 p.m. and 11:59 p.m. -- or during the weekends or holidays -- which would, in the traditional paper filing system that Courthouse News uses for comparison, have been filed and accepted the next business day.  Without that breakdown, it is not possible for the Court to compare the amount of delay caused by the current electronic filing system with the amount of delay inherent in the traditional paper filing system, which Courthouse News uses as a reference point.  Both Courthouse News' and the Defendants' data contain date and time stamp information, and both parties presumably have access to a calendar, and so this analysis is possible theoretically.  Nonetheless, based on the snapshot of data from the Defendants' Summary Table and Defendants' Raw Data  -- which shows a twenty-eight percent discrepancy between the number of cases that were accepted on the same day or date as submission, sixty-five percent, and the percentage of cases that were accepted within twenty-four hours of submission, ninety-three percent -- the Court presumes that the percentages of cases in Courthouse News' Logs would similarly be higher if they had tracked the number of cases accepted within twenty-four hours of their submission.  The Court therefore determines that both parties' failure to analyze the number of cases filed outside regular business hours slants the data in favor of Courthouse News' position, but can make no separate finding of fact on the basis of this omission.

[5] The report states that the average number of days is "0," which the Court assumes means less than one day.  Although the Defendants did not move for the admission of this document at the hearing, the Court determines that it is helpful in determining the facts, and Courthouse News' data from within that same timeframe does not contradict it: if 69.46 percent or 70.46 percent of cases are processed on the same day, see February to June Log at 1; July to September Log at 1, then the statement that the average time for processing was zero days -- meaning less than one day -- also can be correct.

Currency Report").

75.     Between January 1, 2020, and December 30, 2020, the average number of days for a case to go from submission to acceptance in the New Mexico courts was "1."  See Docketing Currentcy Report at 13, filed September 7, 2021 (Doc. 19-1)("2020 Docketing Currency Report").

76.     The Court performed a spot check of the Defendants' Raw Data where the "Formula for Time Elapsed MINUTES" column shows 300 minutes or more (the equivalent of five hours)[6] -- in the first row of Defendants' Raw Data, the case was submitted at 12:26 p.m. on July 23, 2021, and "transmitted" to Odyssey at 8:26 a.m. on July 26, 2021, giving a total of 4080 elapsed minutes and 68 elapsed hours between submission and acceptance -- or transmission. Defendants' Raw Data at 1.

77.     The Court takes judicial notice of the fact that, because July 24-25, 2021, was a weekend, the number of business hours -- between 8:00 a.m. and 5:00 p.m., Monday through Friday -- which elapsed between 12:26 p.m. on Friday 23, 2021, and 8:26 a.m. on Monday, July 26, 2021, was five, rather than sixty-eight total hours.

78.     The third row of Defendants' Raw Data shows that a case was submitted at 2:27 p.m. on Friday, July 23, 2021, and was accepted at 7:58 a.m. on Tuesday, July 27, 2021, giving an elapsed number of minutes of 5371, or 89.51 hours.  Defendants' Raw Data at 1.

79.     The Court takes judicial notice of the fact that, because July 24-25, 2021, was a weekend, the number of business hours which elapsed between 2:27 p.m. on Friday, July 23, 2021, and 7:58 a.m. on Tuesday, July 27, 2021, was twelve hours and thirty-one minutes -- the sum of 2

---

[6]Although the Defendants were impeached on the accuracy of their Summary Table (which included copied and pasted figures and percentages, the Defendants were not impeached by Courthouse News on their Raw Data.

hours and 33 minutes on Friday, nine hours on Monday, and fifty-eight minutes on Tuesday -- rather than 89.51 total hours.

> ### 6.     <ins>Other Jurisdictions' E-Filing Systems</ins>.

80.     The federal court system uses Case Management Electronic Case Files ("CM/ECF"), <ins>see</ins> Electronic Filing (CM/ECF), available at https://www.uscourts.gov/court-records/electronic-filing-cmecf, which provides on-receipt access to non-restricted civil complaints as soon as the filing is accepted and the system has processed it, <ins>see</ins> CM/ECF Administrative Procedures Manual at 2-29, filed October 7, 2021 (Doc. 31); CM/ECF Attorney User Manual (August 2016) at 30-54, filed October 7, 2021 (Doc. 31).

81.     "The federal courts provide access -- most of them, sorry -- and some state courts provide what's called "Auto Accept," meaning that the case is -- let me just quickly explain, if I can: A filer submits an e-filing; it's caught by an e-file manager [ . . . ] [which] can either send the new complaint into a review queue for clerks to look it over and then accept, as they say, or it can process the case on its own right away, and put it into the public queue -- I'm sorry, the public docket." Tr. at 10:5-16 (Girdner).

82.     "[T]his court, for example does that second process, what's called Auto Accept." Tr. at 10:17-18 (Girdner).

83.     "The second system is what's called a press queue system." Tr. at 10:21-22 (Girdner).

84.     "The press queue in its generic form is the equivalent of the wood box." Tr. at 10:25-11:1 (Girdner).

85.     "Are you aware of how these courts prevent confidential information from being sent to the queue?" Tr. at 11:7-9 (Edwards), "Yes. The e-file manager sorts the new cases going

into the review queue by case type," Tr. at 11:10-12 (Girdner).

86.    "I don't believe you can file a case without identifying a case type," and "the e-file manager [ . . . ] filters into the queue the public case types when they're filed."  Tr. at 11:10-15 (Girdner).

87.    "I very rarely see a delay of even 24 hours in the federal court.  And in fact, I can see cases that are field outside of business hours; they seem to turn up in PACER right away."  Tr. at 56:9-12 (Prieskop).

88.    The State courts of Arizona and Utah also provide "on-receipt access."  Tr. 9:21-10:1 (Girdner).

### 7.    **Tyler Technologies' Press Review Queue Feature.**

89.    Tyler Technologies is able to configure its system so that filings are viewable "before they are accepted by the court."  Email from Tyler Technologies' Client Executive Colleen Reilly to James A. Noel, Court Executive Officer for the Second Judicial District at 64-65, filed July 30, 2021 (Doc. 2-2)("Reilly Email").

90.    Tyler Technologies' "Press Review Queue" provides on-receipt access to the public and press.  See Tr. at 11:22-12:7.

91.    The Press Review Queue enables "the e-file manager" to "filter the public case types into the queue, and that's the Press Review Queue," which is "prior to processing."  Tr. at 12:21-25 (Girdner).

92.    "The configuration is in [Tyler Technologies'] database, so it is something Tyler would need to do."  Reilly Email at 65.

93.    "There is no cost associated with this work." Reilly Email at 65.

94.    "The Court would tell [Tyler Technologies] the location and case types that would

be made accessible, and we do the configuration." Reilly Email at 65.

95.   Tyler Technologies recommends that pre-acceptance access "be available only through a courthouse kiosk or computer."  Reilly Email at 65.

96.   Tyler Technologies recommends that users viewing court documents before they are accepted by the court "come to the courthouse to get access to the kiosk to look at the documents . . . .  That way you can maintain control over who is looking and when."  Reilly Email 65.

97.   Tyler Technologies warns, "If you give out a user name and password, there is no way to guarantee that the user name and password are not shared."  Reilly Email at 65.

98.   The "latest communication" Pepin had from Reilly "is that [the Press Review Queue] would cost [NMAOC] $108,000."  Tr. at 148:24-149:5 (Pepin).

**PROCEDURAL BACKGROUND**

Courthouse News filed a complaint and a motion for a preliminary injunction on July 30, 2021, arguing that the Defendants are violating Courthouse News' First Amendment rights to access court documents.  See Complaint at 1; PI Motion at 1-2.  The Defendants responded on September 7, 2021.  See Response at 1.  Courthouse News filed its reply on September 20, 2021.  See Plaintiff Courthouse New Service's Reply In Support of Motion for Preliminary Injunction at 1, filed September 20, 2021 (Doc. 22)("Reply").  The Court held a hearing on the PI on September 28, 2021.  See Clerk's Minutes.

**1.      The Complaint.**

1.    On July 30, 2021, Courthouse News filed its Complaint for Preliminary and Permanent Injunctive and Declaratory Relief.  Courthouse News alleges that Defendants New Mexico Administrative Office of the Courts, Administrative Office Director, Arthur Pepin, the

First Judicial District Court Clerk's Office, and First Judicial Court Clerk Kathleen Vigil ("Defendants") are violating (i) the First Amendment of the United States Constitution, and brings suit pursuant to 42 U.S.C. § 1983; (ii) federal common law, and brings suit pursuant to 42 U.S.C. § 1983; and (iii) Article 2, Section 17 of the New Mexico Constitution, N.M. Const. art. 2 § 17. See Complaint ¶¶ 56-66, at 21-22.

2.     Courthouse News alleges that their reporters' access to new court filings has deteriorated since New Mexico moved to an e-filing system in 2012.  See Complaint ¶ 1, at 1-2; id. ¶¶ 28-29, at 9-10.  Courthouse News alleges that "the means for providing access on receipt are readily available to Defendants" and could be provided in the form of a "press review queue" developed by Tyler Technologies, the same company from whom the New Mexico courts lease their e-filing software.  Complaint ¶ 33, at 11.  Courthouse News asserts that Tyler Technologies will provide this technology to New Mexico courts at no cost.  See Complaint ¶ 35, at 12.

3.     Courthouse News alleges that New Mexico courts' "no-access-before-process" policy causes harm to them because it delays their access to newsworthy stories.  Complaint ¶¶ 37, 40, at 12-13.  Courthouse News cites as one example of harm suffered a twenty-four-hour delay to access a complaint that the New Mexico Environment Department filed against the United States Department of Energy over delays in environmental cleanup at the Los Alamos National Laboratory.  Complaint ¶ 40, at 13.

4.     Courthouse News argues that Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 10 (1986)("Press-Enterprise"), and the persuasive authority of a case Courthouse News brought in the United States Court of Appeals for the Fourth Circuit, see Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021), create a "Right of Contemporaneous Access" to newly filed civil complaints.  See Complaint ¶¶ 42-43, at 14-15.

5.     Courthouse News suggests that the Court apply the <u>Press-Enterprise</u> two-part "history" and "logic" test which the Supreme Court applies to find a right of access in a criminal proceeding here in the context of access to civil complaints.   Complaint ¶ 41, at 13.   Courthouse News contends that there is a tradition of access to civil complaints "throughout the nation's courts and specifically in New Mexico's courts during the era of paper filing."   Complaint ¶ 42, at 14. Courthouse News argues that the <u>Press-Enterprise</u> test's logic prong is met, because the public's ability to be informed about civil complaints "serves a significant positive role in understanding the work of the courts."   Complaint ¶ 43, at 14.   Courthouse News asserts that there is a "presumption in favor of public access to judicial records." Complaint ¶ 44, at 15 (quoting <u>Courthouse News Serv. v. Jackson</u>, C.A. No. H-09-1844, 2009 WL 2163609 at *9 (S.D. Tex. July 20, 2009)(Harmon, J.).

6.     Courthouse News argues that the right of access to court records attaches upon the court's receipt of the filing, and that, once that right attaches, public access must be "contemporaneous." Complaint ¶ 45, at 15.   Courthouse News maintains that, "once the right of access attaches, denial of the right must serve an 'overriding interest' and be 'narrowly tailored.'" Complaint ¶ 48, at 16 (quoting <u>Press-Enterprise</u>, 478 U.S. at 7).   Courthouse News contends that the State's interest here is only "clerical work."   Complaint ¶ 48, at 16.

7.     Courthouse News proposes that it is possible for New Mexico courts to provide "access on receipt," because e-filing software is able to do the work of "clerks at an intake window," such as "identifying [the] court, case type, payment, and much more."   Complaint ¶ 53, at 18.   In an automated system, based on the case "type" that the filer designates, "the e-filer automatically sorts the new, non-confidential complaints into a review queue that serves the same function as the stack of new complaints on top of the cabinet behind the clerk's counter."

Complaint ¶ 53, at 18.  Courthouse News contends that Tyler Technologies is willing to provide

the press review queue to New Mexico courts for no additional cost.  <u>See</u> Complaint ¶ 54, at 18.

8.      Courthouse News contends that the Defendants are violating Courthouse News'

First Amendment right to "timely access to public court records" and are acting under color of

State law.  Complaint ¶ 56-57, at 19.  Courthouse News contends that the Defendants are violating

their "right of access to public court records guaranteed by federal common law."  Complaint ¶ 60,

at 19-20.  Courthouse News asserts that the Defendants are violating Article 2, Section 17 of the

New Mexico Constitution by denying them "timely access to new civil court complaints," and

through the:

> Defendants' elevation of themselves above the news media to a favored position
> with respect to the publication of public court records, in order to extract income
> from them, deprive members of the press, including Courthouse News and by
> extension its subscribers, of their right of access to public court records secured by
> the free press provision of Article 2, Section 17 of the New Mexico Constitution.

Complaint ¶ 64, at 20.

9.      Courthouse News contends that it has "no adequate and speedy remedy at law to

prevent or redress Defendants' unconstitutional actions, and will suffer irreparable harm as a result

of Defendants' violation of its First Amendment rights," Complaint ¶ 58, at 19, its federal common

law rights, <u>see</u> Complaint ¶ 62, at 20, and its violation of the New Mexico Constitution, <u>see</u>

Complaint ¶ 66, at 21.  Courthouse News requests a preliminary and permanent injunction against

the Defendants, and declaratory judgment pursuant to 28 U.S.C. § 2201.  <u>See</u> Complaint at 21.

### 2.      <u>The PI Motion.</u>

10.     On July 30, 2021, Courthouse News filed its PI Motion.  <u>See</u> PI Motion at 1;

Plaintiff Courthouse New Service's Memorandum of Law in Support of Motion for Preliminary

Injunction, filed July 30, 2021 (Doc. 2-1)("PI Memo.").  In its PI Memo., Courthouse News argues

that: (i) it is likely to succeed on the merits of its First Amendment claim, and (ii) that Courthouse News will suffer irreparable harm if the Court does not issue an injunction.  See PI Memo. ¶ 54, at 20; id. ¶ 20, at 7-8.  Courthouse News argues that, when weighing the factors of a First Amendment PI case, "the pivotal factor is the likelihood of success because, if established, irreparable injury is presumed."  PI Memo. ¶ 19, at 7 (citing Heideman v. South Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003)).

11.   Courthouse News argues that "the press and the public hold a First Amendment right of access to public court records, including civil complaints, that attaches when they are filed with a court,"  PI Memo. ¶ 20, at 7, and that "right can only be overcome by an overriding governmental interest in closure, and that closure must be narrowly tailored to the concern the state has identified."  PI Memo. ¶ 20, at 7-8.  Courthouse News contends that "every federal circuit to consider the First Amendment right of access . . . ha[s] concluded that the right of access to judicial records extends to both civil and criminal proceedings,"  PI Memo. ¶ 22, at 8, and that, where "the First Amendment right of access applies, it attaches upon receipt," PI Memo. ¶ 23, at 9.

12.   Courthouse News argues that the "experience" prong of the Press-Enterprise test requires timely access to civil petitions, because, "'historically, courts have openly provided the press and general public with access to civil complaints.'"  PI Memo. ¶ 25, at 10 (quoting Courthouse News Serv. v. Schaefer, 440 F. Supp. 3d 532, 557 (E.D. Va. 2020).  Courthouse News similarly argues that the Press-Enterprise test's "logic" prong is met, because "federal courts have consistently held that access to court records is vital to an open, democratic government and an informed citizenry."  PI Memo. ¶ 27, at 11 (quoting Bernstein v. Bernstein Litowitz Berger & Grossman LLP, 814 F.3d 132, 141 (2nd Cir. 2016)).

13.   Next, Courthouse News argues that there is no "overriding interest" that justifies

limiting the right of access, and that restrictions are not "narrowly tailored."  PI Memo. ¶ 34, at 14

(quoting Press-Enterprise, 478 U.S. at 9).  Courthouse News asserts that the interest at stake here

is the "state's interest in clerical processing," PI Memo. ¶ 34, at 14, and that, "[t]he clerical work

of Defendants, while important to the orderly administration of justice, is not an interest that

overrides the First Amendment right of timely access," PI Memo. ¶ 35, at 14.  Courthouse News

asserts that the "no-access-before-process-policy" it attributes to the Defendants is not narrowly

tailored.  PI Memo. ¶ 36, at 15.  Courthouse News suggests that the Defendants can accomplish

their clerical work in a more narrowly tailored manner, see PI Memo. ¶ 36, at 15, by "direct[ing]

their e-file vendor to install the same press review queue installed in other courts,"  PI Memo. ¶

37, at 15.

14.     Courthouse News rejects the idea that confidentiality concerns justify "no-access-

before-process" policies, because, "[i]n New Mexico, as in every state in the nation with the

exception of Vermont, the responsibility to redact e-filings is placed solely and entirely on the

filer."  PI Memo. ¶ 49, at 19 (citing N.M. Dist. Ct. R. Civ. Proc. 1-079(D)).  In New Mexico, filers

must "designate the type of case they are filing," and "courts all around the nation, including this

Court, are able to screen for non-public filings while making the public filings available at the time

of receipt."  PI Memo. ¶ 50, at 19.

15.     Courthouse News argues that it will suffer "irreparable harm without injunctive

relief" and contends that "the loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury."  PI Memo. ¶ 54, at 20 (quoting Heideman v. South

Salt Lake City, 348 F.3d at 1190 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  Finally,

Courthouse News argues that injunctive relief is in the public interest, because there is "an

important First Amendment interest in providing timely access to new case-initiating documents."

PI Memo. ¶ 55, at 21 (quoting Courthouse News Service v. Tingling, No. 17 C 7933, 2016 WL 8739010 at *20 (S.D.N.Y. Dec. 16, 2019)(Ramos, J.).

**3.      The Defendants' Response.**

16.      The Defendants filed the Response to Plaintiff's Motion for Preliminary Injunction on September 7, 2021. See at 1.  The Defendants affirm that "press access to court documents is vital to the democratic process and that the press should be afforded access to these court documents as soon as is practicable."  Response at 1.  The Defendants contend that the NMAOC and court clerks work to "ensure expeditious administrative procedures between receipt and acceptance."  Response at 2.

17.      While the Defendants support Courthouse News' desire to have "expedient access to newly-filed, non-confidential, civil complaints," they counter that this access is "already available immediately to the press and public upon filing and acceptance."  Response at 2.  The Defendants respond to Courthouse News' request to access complaints immediately upon receipt or submission -- as opposed to upon acceptance -- by arguing that the State has "a strong governmental interest in maintaining an administrative process . . . to ensure the protection of the litigants and the smooth operation of the judiciary."  Response at 2.

18.      The Defendants respond to data Victoria Prieskop, a reporter for Courthouse News Services, offers, by stating that it "fails to take weekends or holidays into account, and fails to demonstrate a consistent methodology for determining when the case was 'available for review.'" Response at 3 (quoting Declaration of Victoria Prieskop in Support of Plaintiff Courthouse News Service's Motion for Preliminary Injunction ¶¶ 15-16 at 7, filed July 30, 2021 (Doc. 2-3)("Prieskop Decl.")).   The Defendants claim that, contrary to Courthouse News' assertions that Tyler Technologies would implement a press review tool for free, Tyler Technologies would charge

NMAOC "approximately $108,000 annually."  Response at 6 (citing Noel Decl. ¶ 16, at 7).

19.     The Defendants describe the review process that filings undergo once an attorney submits them on Odyssey File & Serve:

a.      "The document is sent to a review queue for clerical review in the court in which the pleading will be filed."  Response at 7.

b.      Clerks then "ensur[e] the document is in the correct court, verify[] the pleading type has been correctly identified, assign[] a case number, and verify[] the pleading is not subject to an order to seal, an order for free process, or rejection for some reason."  Response at 7 (citing Noel Decl. ¶¶ 6, 14, at 3-4, 7).

20.     The Defendants argue that "[o]nce all of the information is verified and any confidential information is redacted or sealed, the clerk 'accepts' the pleading and renders it part of the docket, wherein it becomes an official court record."  Response at 7 (citing Noel Decl. ¶¶ 6, at 3-4; id. ¶ 14, at 7).   The Defendants assert that there is "no delay between acceptance and viewing by the press as long as members of the press have a free account to view accepted pleadings in SOPA."  Response at 7.   The Defendants assert that the average time for "administrative processes" -- "the average time between attorneys clicking 'submit' on Odyssey File & Serve to the point when the pleading is accepted by the clerk" -- is 7.14 hours, and the median time is 35 minutes.  Response at 8 (citing Noel Decl. ¶¶ 8, 10, at 4-5).

21.     The Defendants argue that Courthouse News cannot succeed on the merits of its First Amendment claim because "the federal court does not have subject matter jurisdiction over a challenge to a New Mexico Supreme Court Order" and should abstain under Younger v. Harris, 401 U.S. 37 (1971).  Response at 9.  Because Orders of the New Mexico Supreme Court and Rules of Civil Procedure require clerks to review electronically submitted complaints, the Defendants

urge the Court to abstain.  Response at 9-10 (citing N.M.R.A. 12-307.2; Supreme Court Order 17-8500-001).

22.     The Defendants assert that "the date and time that the filer submits the electronic filing envelope will serve as the filing date and time for the purposes of meeting any filing deadline," Response at 9-10 (quoting NMRA 12-307.2(F)), but the filings are not "actually 'filed or 'accepted' until the clerk's office determines that they do not improperly include excluded documents," Response at 10 & n.8 (citing Ennis v. Kmart Corp., 2001-NMCA-068, ¶ 7, 131 N.M. 32, 33 P.3d 32, 36).

23.     The Defendants note that the clerks must determine that filings do not include improperly one of the "ten categories of excluded documents" listed in NMRA 1-079(C)(1)-(10), including documents containing confidential information.  Response at 10.  The Defendants assert that the Supreme Court of New Mexico's Order No. 17-0085-001 "does not allow press access to confidential information," and that, while rules 1-079 and 1-005.2 do not "require a clerk to screen for protected personal identifier information (PPII)," they "do imply that the clerk is able to reject, or return to the filer, a pleading if it includes information that should be sealed or otherwise remain confidential."  Response at 10 (citing Supreme Court of New Mexico, Order No. 17-0085-001, In the Matter of the New Mexico Judiciary Case Access Policy for Online Court Records 14-17 (February 20, 2017), filed September 7, 2021 (Doc. 19-1)("Order No. 17-0085-001")).

24.     The Defendants argue that Younger abstention is "appropriate in situations where federal courts would interfere with pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  Response at 11 (quoting Sprint Commc'n, Inc. v. Jacobs, 134 S. Ct. 584, 591 (2013)).   The Defendants imply that an order from the Supreme Court of New Mexico is "an ongoing, standing

order" which furthers the state courts' ability to perform their judicial functions and argue that the order "implicates an important State interest" in screening pleadings that are confidential. Response at 11.  The Defendants assert that Courthouse News should bring its claim in State court, which has concurrent jurisdiction over § 1983 claims, and should seek to enjoin the Supreme Court of New Mexico's Order there.  Response at 11-12.

25.    The Defendants point to the United States Court of Appeals for the Seventh Circuit's reversal of a district court's decision not to abstain on a similar claim brought by Courthouse News, concluding that a State has "a substantial interest in . . . running its own court system."  Response at 12 (citing Courthouse News Serv. v. Brown, 908 F.3d 1063, 1073 (7th Cir. 2018)).  The Defendants point to Younger abstention's underlying principle of comity, which "is particularly significant when federal courts are asked to decide how state courts should conduct their business."  Response at 12-13.  The Defendants argue that New Mexico courts "are best positioned to interpret their own orders, . . . and to craft an informed and proper balance between the state courts' legitimate institutional needs and the public's and the media's substantial First Amendment interest in timely access to court filings," and urge the Court to abstain from this case. Response at 13 (citing Courthouse News Serv. v. Brown, 908 F.3d at 1074).

26.    The Defendants next argue that New Mexico courts already offer "immediate press access to all pleadings once the pleadings are accepted," which requires a free "tier one" account on SOPA.  Response at 14.  The Defendants assert that a First Amendment right does not attach to "newly-*submitted*" rather than newly-accepted civil complaints.  Response at 14 (emphasis in original).  The Defendants cite the United States Court of Appeals for the Ninth Circuit's opinion in Courthouse News Serv. v. Planet, 947 F.3d 581, 594 (9th Cir. 2020), in asserting that there is a "qualified right of timely access to newly-filed nonconfidential civil complaints."  Response at

14-15 (quoting <u>Courthouse News Serv. v. Planet</u>, 947 F.3d at 594).

27.     The Defendants continue to cite the Ninth Circuit's opinion in <u>Courthouse News Serv. v. Planet</u> for the proposition that this qualified right of access "does not entitle the press to immediate access to those complaints," and that this qualified right of access may include "[s]ome reasonable restrictions resembling time, place and manner regulations . . . ."  Response at 14-15 (quoting <u>Courthouse News Serv. v. Planet</u>, 947 F.3d at 585).  The Defendants also point to a recent decision from the United States Courts of Appeals for the Fourth Circuit, which concludes that limitations on access that resemble reasonable time, place, and manner restrictions are not subject to strict scrutiny.  Response at 15 (citing <u>Courthouse News Serv. v. Schaefer</u>, 2 F.4th 318, 328 (4th Cir. 2021)).

28.     The Defendants next argue that NMAOC survives <u>Press-Enterprise</u>'s two-prong test, which requires that the State's interest in "the fair and orderly administration of justice would be impaired by immediate access, and  [ . . . ] that no reasonable alternatives exist to 'adequately protect' that government interest."  Response at 16-17 (quoting <u>Press-Enterprise</u>, 478 U.S. at 14).  The Defendants assert that clerks are performing cursory and necessary checks, and that it would "be a significant hardship" to "make these complaints available a few hours sooner" than is currently the case.  Response at 17.  The Defendants dispute Courthouse News' characterization that their processing delay -- where "93% of pleadings are made available within 8 business hours" -- is significant, and question whether such a delay needs any justification.  Response at 18.

29.     The Defendants argue that any injunction requiring a reduction in processing time "would not be in the public interest," because NMAOC is already "in compliance" with the Fourth Circuit's standard of making the complaints available as expeditiously as possible.  Response at 19.  The Defendants compare their statistics favorably with those the court disapproved in

Courthouse News Serv. v. Schaefer and argue that other jurisdictions "have resorted to an earlier receipt deadline to increase their rate of documents accepted the same day of submission." Response at 19 (citing Courthouse News Serv. v. Schaefer, 2 F.4th at 327, 329).

30.     The Defendants assert that the midnight filing deadline is necessary to accommodate logistical and technical difficulties arising in a large and rural State such as New Mexico, and that "eliminating this concession for the sole purpose of marginally improving AOC's filing statistics would serve no practical purpose and would not be in the public interest." Response at 20.  The Defendants argue that the gap between submission and acceptance could only be narrowed in one of three ways: (i) an order compelling the e-file service to provide pre-acceptance access to Courthouse News; (ii) to forgo NMAOC's clerk review process and allow Courthouse News to access unreviewed documents, in violation of New Mexico Supreme Court Order 17-8500-001; or (iii) for NMAOC to hire "significantly more staff to process incoming complaints." Response at 22-24.

31.     First, the Defendants argue that implementing Tyler Technologies' press review tool would require "significant resources to obtain and implement." Response at 20.  Second, the Defendants argue that removing clerk review of documents would endanger vulnerable parties, go against New Mexico law and procedural rules, and cause confusion to the public if documents have to been withdrawn after being made public.  See Response at 21.  The Defendants note that, currently, attorneys or parties may contact the clerk, and amend or withdraw pleadings before they are accepted, because, after it is accepted, it "becomes a part of the court record and cannot be amended without a judicial action."  Response at 21-22 (citing Noel Decl. ¶ 14, at 7).  If media organizations are able to access documents that are submitted but not accepted, the Defendants argue, the public would be confused about the nature of ongoing litigation if those documents were

subsequently revised because of deficiencies or other changes.  See Response at 22.  Third, the Defendants claim that keeping the review process but narrowing the time gap would require significant numbers of additional staff, or that implementing the press review tool would cost $108,000 a year as well as costs for NMAOC's own "testing, validation, and implementation" process, both of which would require the New Mexico legislature's approval.  Response at 11.

32.     The Defendants urge the Court that, should the Court issue an injunction, it should issue a "sizeable" bond  pursuant to rule 65(c) of the Federal Rules of Civil Procedure, which would cover the cost of Defendants' implementation of the changes Courthouse News seeks.

**4.     Courthouse News' Reply.**

33.      Courthouse News urges the Court not to abstain, arguing that there is no "ongoing state judicial proceeding," and that the New Mexico Supreme Court Order in question does not conflict with the relief Courthouse News seeks.  Reply at 2.  Courthouse News argues that New Mexico Supreme Court Order 17-8500-001 is "not judicial in nature, nor is it the type of proceeding to which Younger might apply."  Reply at 3.  Courthouse News argues that the Defendants' abstention argument is based on Seventh -- and not Tenth -- Circuit precedent, so it is not binding here.  See Reply at 4.

34.     Courthouse News contests the Defendants' characterization of the Supreme Court of New Mexico's Order as requiring clerks to "review electronically submitted complaints before determining whether to reject or accept them."   Reply at 5-6 (quoting Response at 9-11).  Courthouse News counters the Defendants' suggestion that rule 1-079(C) NMRA requires this screening by stating that sealed cases "are automatically sealed without a motion or order," and "are excluded from the types of cases that can be e-filed with the New Mexico courts."  Reply at 6.

35.     Courthouse News asserts that "a court clerk lacks the discretion to reject pleadings for technical violations."  Reply at 6 (quoting Ennis v. Kmart, 2001-NMCA-068, ¶ 10, 131 N.M. 32, 33 P.3d 32, 36).  Courthouse News notes that the Defendants' list of rejection reasons "does not identify inclusion of confidential information as a basis for a clerk to reject a filing," although it identifies sealed documents as such as basis.  Reply at 7 (citing Rejection Reasons at 19-20, filed September 7, 2021 (Doc. 19-1).  Courthouse News argues that the First Amendment right of access attaches "to new civil complaints when they are filed with the court," and that the Defendants cannot "invent a new definition for when a complaint is filed -- ie. when it is 'accepted.'"  Reply at 7 (quoting Response at 14).

36.     Courthouse News argues that New Mexico courts "recognize that a document is filed when it is 'delivered' to the court clerk," Reply at 7-8 (quoting Town of Hurley v. New Mexico Mun. Boundary Comm'n, 1980-NMSC-083, ¶ 11, 94 N.M. 606, 608, 614 P.2d 18, 20), and that other jurisdictions share this definition of "filed," the Ninth Circuit in particular, Reply at 8 (citing Klemm v. Astrue, 543 F.3d 1139, 1142 (9th Cir. 2008); Courthouse News Serv. v. Planet, 2016 WL 4157210, *13 (C.D. Cal. May 26, 2016)).  Courthouse News urges the Court to conclude that the First Amendment right of access attaches at the time of submission, rather than at the time of acceptance, of civil complaints.  See Reply at 9.

37.     Courthouse News contests the Defendants' framing of their request as being for immediate access; instead, Courthouse News counters that "the question is whether Defendants' policy of withholding access to new civil petitions until after processing and 'acceptance' can survive constitutional scrutiny," given that such delays are subject to "Press-Enterprise scrutiny." Reply at 9.  Courthouse News argues that the Defendants' screening policy does not survive constitutional scrutiny, and that the Defendants' data does not "refute Courthouse News' evidence

of delays." Reply ay 10. Courthouse News critiques the docket currency reports attached to Judge James Noel's affidavit as being vague and inapposite. <u>See</u> Reply at 11.

38. Further, Courthouse News argues that any delays to public access to civil complaints cannot be justified under constitutional scrutiny; it contends that the Defendants have failed to identify a statute or rule which prevents them from providing "pre-processing access" to new complaints. Reply at 12. Finally, Courthouse News counters the Defendants' assertions about the cost of Tyler Technologies' press review tool by pointing to Pepin's "acknowledgment in his 2018 Memorandum to the Justices of the Supreme Court of New Mexico that Tyler can install a press queue 'at no cost to the courts.'" Reply at 12 (quoting Pepin Memorandum at 21, filed July 30, 2021 (Doc. 2-2)("Pepin Memo.").

**5.    <u>The PI Hearing.</u>**

39. The Court held a hearing on September 28, 2021. <u>See</u> Clerk's Minutes. The Court invited Courthouse News to speak in support of its request for a PI. <u>See</u> Tr. at 3:6-8 (Court). The Plaintiffs first called William Girdner, the Editor of Courthouse News, to testify. <u>See</u> Tr. at 4:24 (Edwards); <u>id.</u> at 5:16-17 (Girdner). Girdner described the process Courthouse News reporters used to review paper filings before the courts used an electronic filing system. <u>See</u> Tr. at 7:15-22 (Girdner). Girdner stated that Courthouse News is seeking "[o]n-receipt access, also described as contemporaneous access," but that Courthouse News is not seeking immediate, instantaneous access to new civil complaints. Tr. at 8:5-14 (Girdner). Girdner seeks access to filings "after the case is received and before it's docketed; what's now called processing." Tr. at 8:15-18 (Girdner). When questioned whether he seeks "the same level of access that was provided before electronic filing," Tr. at 8:19-20 (Edwards), Girdner replied: "That's traditional access," Tr. at 8:21

(Girdner).

40.     Girdner described the news cycle as a daily cycle where the press reports on events in the morning and during the day, and the public consumes the news in the evening.   See Tr. at 9:1-9 (Girdner).  Girdner stated that gaining access to newly filed civil complaints within twenty-four hours or forty-eight hours is not sufficient because, by then, "It's old news, it's stale, and it's -- yeah, current news is what's vibrant and strong and resonates."  Tr. at 9:12-14 (Girdner). Girdner seeks this level of access only for newly filed civil complaints, and not also for subsequent filings in existing cases.  See Tr. at 9:15-17 (Edwards); id. at 9:18-20 (Girdner).

41.     Girdner described how other courts, such as the United States District Court for the District of New Mexico, and the State courts of Arizona and Utah provide "on-receipt access." Tr. at 9:23-10:1 (Girdner).   Girdner described a Tyler Technologies product called the Press Review Queue which would provide on-receipt access to the public and press.  See Tr. at 12:1-7 (Girdner).  The Press Review Queue enables "the e-file manager" to "filter the public case types into the queue, and that's the Press Review Queue," which is "prior to processing."  Tr. at 12:21-25 (Girdner).

42.     Girdner stated that the Press Review Queue is "normally implemented for free," and described how Tyler Technologies had implemented a Press Review Queue in San Mateo, California, free of charge.   Tr. at 13:7-8 (Girdner); id. at 13:11-13 (Girdner); id. at 13:23-25 (Girdner).   Other vendors, such as the one which implemented a Press Review Queue in Arizona, charged $12,500.00 to set up the system from scratch.  See Tr. at 14:5-7 (Girdner); id. at 14:10-14 (Girdner).  Girdner described his efforts to request a Press Review Queue for New Mexico Courts before this litigation by approaching NMAOC and the Supreme Court of New Mexico.  See Tr. at 15:3-7 (Girdner); id. at 15:12-15; id. at 15:18-21 (Girdner).  Girdner read from Pepin Memo.: "I

confirmed that Nevada, Georgia, and California have had Tyler install at no cost to the courts a press queue as Mr. Girdner requests of New Mexico."  Tr. at 17:1-16 (Girdner)(quoting Pepin Memo. at 21).

43.     Girdner discussed lawsuits that Courthouse News has brought in other jurisdictions. See Tr. at 26:4-29:16 (Girdner).  Girdner stated that the difference between what SOPA provides and the Press Review Queue that Courthouse News seeks is that "documents flowing into SOPA are delayed  past processing.  If they were not delayed, if they were upon submission, it would be a fantastic press queue,"  Tr. at 31:2-7 (Girdner), and that "the cases populated to SOPA are only after clerical and administrative processing occurs," Tr. at 32:20-23 (Edwards).

44.     Girdner described some of the safeguards which ensure that confidential or sealed documents are not made available to the press or public, such as permissions-based access, which can be withdrawn if a reporter discloses PPII or other confidential or sealed information, and user non-disclosure agreements.  See Tr. at 33:19-34:8 (Girdner); id. at 36:16-19.  Another safeguard is a case type filter -- an e-file manager allows the filer to choose whether the case is public or non-public, and non-public cases are diverted from the press review queue.  See Tr. at 38:5-17 (Girdner).

45.     In discussing the paper filing system, Girdner admitted that Courthouse News reports would have access to a filed document only after the clerk had reviewed and stamped the document:

> Q.     At what point during that process did Courthouse News Services used to be able to obtain the document?
>
> A.     Right after it came across the counter.
>
> Q.     Before or after the clerk stamped it?

A.      After.  We would not take it out of the clerk's hand.

Tr. 45:7-13 (Girdner, Lecocq).

46.      Courthouse News next called Victoria Prieskop, a reporter for Courthouse News.
See Tr. at 50:17-51:7 (Prieskop).   Prieskop described the process of reviewing new civil
complaints filed before the e-filing system became prevalent between 2012 and 2014 in New
Mexico.  See Tr. at 52:14-53:12 (Prieskop).  Prieskop alleges that she sometimes had access to
documents that had not yet been process or docketed.  See Tr. at 53:1-7 (Prieskop)("I would go
through both the docketed cases and the cases that had been received but not yet fully proceesed.").
Prieskop asserts that her access to civil complaints is worse now than before e-filing.  See Tr. at
55:16-18 (Prieskop).  Prieskop compared New Mexico's e-filing system with the federal PACER
e-filing system, which enables her to see cases filed as soon as they are submitted, even if this
review is outside of business hours.  See Tr. at 56:9-14 (Prieskop).

47.      Prieskop described the process by which she created the Media News Logs which
were attached as Exhibit B-1 and B-2 to her declaration.  See Tr. at 57:8-61:13 (Prieskop)(citing
February to June Log; July to September Log, admitted as Exhibit 5).  Prieskop described the
contents of the Santa Fe Log.  See Tr. at 62:1-63:9 (Prieskop).

48.      Next, the Defendants called their first witness, Laura Orchard, a senior IT project
manager for NMAOC.  See Tr. at 73:1-25 (McDonald, Orchard).  Orchard described the e-filing
system that New Mexico uses.  See Tr. at 76:7-81:22 (Orchard).  Upon cross examination, Orchard
admitted that the percentage of statewide civil filings accepted on the same date as submission
from the top row of the Defendants' Summary Table is wrong and should read 67.47 percent
instead of seventy-nine percent.  See Tr. at 94:7-23 (Orchard).  Orchard also admitted that, based
on the numbers from the Defendants' Summary Table, the percentage of statewide civil district

filings accepted on the same date as submission was 69.68 percent and not seventy-nine percent. See Tr. at 96:10-23 (Orchard).  Orchard also admitted that, based on the numbers shown from the Defendants' Raw Data, the percentage of statewide civil district initial filings accepted the same days as submission should read sixty-five percent, instead of seventy-nine percent.  See Tr. at 96:10-13 (Orchard).

49.     The Defendants next called Arthur Pepin, NMAOC's Director.  See Tr. at 102:15-25 (Lecocq, Pepin).  Pepin presented information about the work of the NMAOC, the Judicial Information Division ("JID"), JTECH, which is the statewide technology council, and the Online Access Subcommittee ("OAS").  See Tr. at 103:17-105:21 (Pepin).

50.     Pepin stated that part of NMAOC's job is to ensure public access to documents under the New Mexico Inspection of Public Records Act ("IPRA"), but without compromising PPII.  Tr. at 108:11-20 (Pepin).

51.     Pepin described his understanding of NMAOC's goal of ensuring the efficient operation of the judicial system.  See Tr. 117:23-119:11 (Pepin).  Pepin described the reasons why clerks need to screen court filings rather than use an automated process, including the screening process that clerks have to do when self-represented litigants file documents, and for screening documents for PPII.  See Tr. 130:1-134:7 (Pepin).

52.     Pepin stated that, although Tyler Technologies was offering the Press Review Queue for free in 2018 when he wrote the Memorandum, the "latest communication" he has from Tyler Technologies, "from Ms. Reilly, the same person here, is that it would cost us $108,000." Tr. at 148:24-149:5 (Pepin).  In addition, Pepin stated that "[t]he costs to us are much more significant than the $108,000." Tr. at 149:7-8.  Pepin continued:

Certainly, it would take staff time, staff who are already assigned duties, they would

have to stop them from doing.  The same thing with money.  I'd have to take money from somewhere to pay for this if there is a financial cost to it.  And then it seems to me that we would have to figure out how to comply with whatever order had directed us to adopt the press queue in a way that also complied with our other statutory obligations, our obligations to protect information and make sure things that get filed are filed appropriately and all that.  It also seems that when a proposed filing -- not a proposed filing, that's a different technical term -- when a complaint is submitted for filing, if it gets rejected, we'd somehow have to try to pull that back, or I don't  know exactly.  We'd have to do some kind of monitoring so that documents that had gone through this queue came out of it, or we notified the parties that, in fact, this is not a document the court  accepted.

But there would be costs in terms of time and interactions with Tyler.  I don't know much about technology.  But what I've learned in 15 years is it always takes more time and costs more money than you expect.  Not necessarily the check I have to write to Tyler, but in terms of spending limited resources we have at JID and elsewhere.  We have to train our clerks, we have to retrain them in how we're going to run the system, what this queue does.  I can't just have a new queue out there, and they would see it, and they would say -- I have to train them about it, notify them, all that kind of thing.  There would be costs there in time and talent.

Tr. at 149:15-150:23 (Pepin).

53.     Pepin expressed concerned that,

The sooner the access goes, back in the system, the greater risk that we are publishing information either that we should keep confidential or in a way that, you know, gives access to confidential information.  And I think I said this before, the reason why attorneys are filers is because they have to listen to the orders of the Court, and what they say.  And others, you know, we don't have any control [over] the press, or whoever might be the press.  I have no concerns about CNS.  They appear to be a top-flight superb First Amendment press organization.  But I doubt an order would limit us in ways that we could keep restricting information in the way we do now at least for things that have been filed, been accepted.  So things would get out there to other folks who call themselves press, or who would try to save their right of access, the same as that of CNS.  But if we do, we'd have to be compliant.

Tr. at 152:10-153:4 (Pepin).

54.     Pepin stated that the possibility of rescinding access to users who publicized sealed

or confidential information would not be enough protection, because "the more attenuated you get

from lawyers, who are under the Supreme Court . . .  to others who might qualify as press, the less

likely it is you're able to exercise a kind of protection you want to exercise on what should be kept private."  Tr. at 154:6-12 (Pepin).

55.     Pepin stated that, in a unified court system, one county by itself "couldn't decide to do what you are asking on their own in this state, in New Mexico. It would have to be a determination by the Supreme Court that the statewide system, would make these documents accessible at the time – at the point you're asking."  Tr. at 159:8-17 (Pepin).

56.     The Defendants next called Suzanne Winsor, the IT Odyssey Support Manager for the NMAOC's JID.  See Tr. at 174:11-21 (McDonald, Winsor).  Among other things, Winsor's department supports the Odyssey Public Access application ("OPA"), which is designed to help self-represented litigants create forms or pleadings to be filed in the court and is accessed in the kiosks of courthouse lobbies.  See Tr. 175:22-176:3 (Winsor); id. at 179:6-10 (Winsor).  Winsor testified about the screening process that clerks perform in the current e-filing system.  See Tr. at 180:9-183:1 (Winsor).

57.     The Defendants next called Monica Baca, a Deputy Court Executive Officer with the Second Judicial District court.  See Tr. at 196:7-17 (McDonald, Baca).  Baca testified that her office processes around 1800-2000 filings a day, see Tr. at 197:25-198:3 (Baca), and testified about the work of the clerks in her office and in particular, for what clerks screen filings.  See Tr. at 198:16-205:25 (Baca).

58.     Finally, the Defendants called Judge James Noel, who is a District Court Judge for the Thirteenth Judicial District Court of New Mexico, and was formerly a Court Executive Officer for the Second Judicial District Court.  See Tr. at 213:1-16 (Lecocq, Noel).  Judge Noel testified about the attempts that Courthouse News made to get NMAOC to install a Press Review Queue before the current litigation.  See Tr. at 223:20-225:10 (Noel).

**CONCLUSIONS OF LAW**

**LAW REGARDING FEDERAL-QUESTION JURISDICTION**

1.     Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction.  See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974); Chavez v. Kincaid, 15 F. Supp. 2d at 1119.  A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  There is a federal question if the case arises under the Constitution, laws, or treatises of the United States.  See 28 U.S.C. § 1331.  Whether a case arises under a federal law is determined by the "well pleaded complaint rule," Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 9 (1983), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)).  This determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose."  Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 10 (citing Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)).  The Supreme Court has further limited subject-matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action.  See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 25-26.  The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813 (1986).  See Sandoval v. New Mexico Tech. Grp., L.L.C., 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("*Merrell Dow* is the Controlling law when invoking subject matter jurisdiction" when a right under state

law turns on construing federal law).  District courts must exercise "prudence and restraint" when determining whether a federal question is presented by a state cause of action because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system."  Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810.

2.      In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'"  Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)).  If the resolution turns on a substantial question of federal law, the federal question must also be "contested."  Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005). Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  542 U.S. at 313.  Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts.  542 U.S. at 313.  See Darr v. N.M. Dep't of Game & Fish, 403 F. Supp. 3d 967, 1012 (D.N.M. 2019)(Browning, J.)(explaining that, to establish federal-question jurisdiction, "the federal question must also be 'actually disputed,' and its necessary to the case's resolution" (quoting Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314)); Bonadeo v. Lujan, 2009 WL 1324119, at *7-9.

## LAW REGARDING YOUNGER ABSTENTION

3.     "Generally, federal courts must exercise their jurisdiction when available. However, principles of 'equity, comity, and federalism' motivate a 'longstanding public policy against federal court interference with state court proceedings.'"  Rocky Mountain Gun Owners v. Williams, 671 F. App'x 1021, 1024 (10th Cir. 2016)(quoting Steffel v. Thompson, 415 U.S. 452, 460-61, (1974), and citing Younger v. Harris, 401 U.S. 37, 43-45 (1971)("Younger"); Sprint Commc'ns, Inc. v. Jacobs, 581 U.S. 69, 73 (2013)("Sprint")).  The framers of the Constitution designed a system in which

> there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

> Younger, 401 U.S. at 44.

4.     Under the abstention doctrine that the Supreme Court of the United States articulates in Younger, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief.  Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)).  A court in the Tenth Circuit should abstain from entertaining cases which implicate the Younger doctrine, so long as an adequate opportunity is afforded in the State court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291.  This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs."  J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga

Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)).   The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' rather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief."   Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996).

     5.     For Younger abstention to be appropriate, the Tenth Circuit has ruled that three conditions must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78.  See Bellotti v. Baird, 428 U.S. at 143 n.10 (noting that when all of the conditions mandating abstention clearly exist in the record, courts should address application of the Younger abstention doctrine sua sponte); Morrow v. Winslow, 94 F.3d at 1390-91 & n.3.  Before examining the three-factor test, the Court first must address whether this case is one that allows for Younger abstention at all.   The Supreme Court has defined the appropriate set of cases narrowly: "Circumstances fitting within the Younger doctrine, we have stressed, are 'exceptional'; they include . . . [i] 'state criminal prosecutions,' [ii] 'civil enforcement proceedings,' and [iii] 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."  Sprint, 581 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368).

     6.     The Tenth Circuit subsequently has "applie[d] [Younger] to three categories of state cases."  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 670 (10th Cir. 2020). See Catanach v. Thomson, 718 F. App'x 595, 598 n.2 (10th Cir. 2017)(noting that Sprint

"significantly limited the reach of <u>Younger</u> to only" three situations, and that <u>Sprint</u> "also discounted reliance on the three factors outlined" in <u>Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423, 433-434 (1982)("<u>Middlesex</u>")); <u>MacIntyre v. JP Morgan Chase Bank</u>, No. 12-CV-2586-WJM-MEH, 2015 WL 1311241, at *2 (D. Colo. Mar. 19, 2015)(Blackburn, J.)("Thus, the Court agrees with Plaintiff that <u>Sprint</u> significantly cabined the breadth of <u>Younger</u> abstention as it has been applied in this circuit."); <u>Brumfiel v. U.S. Bank, N.A.</u>, No. 14-CV-2453-WJM, 2014 WL 7005253, at *3 (D. Colo. Dec. 11, 2014)(Martinez, J.)("[I]n <u>Sprint</u>, the Supreme Court reversed a decision by the Eighth Circuit Court of Appeals that applied <u>Younger</u> abstention using substantially the same analysis as in [<u>Amanatullah v. Colo. Bd. Of Med. Examiners</u>, 187 F.3d 1160 (10th Cir. 1999)][.]"); <u>Conry v. Barker</u>, No. 14-CV-02672-CMA-KLM, 2015 WL 5636405, at *6 (D. Colo. Aug. 11, 2015)(Mix, M.J.).

7.     In <u>Sprint</u>, the Supreme Court clarified that "[t]he three <u>Middlesex</u> conditions . . . were not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking <u>Younger</u>." <u>Sprint</u>, 571 U.S. at 81 (emphasis in original).  In <u>Hunter v. Hirsig</u>, 660 F. App'x 711 (10th Cir. 2016)(unpublished)("<u>Hunter</u>"), the Tenth Circuit continued to use similar factors to determine whether <u>Younger</u> abstention is non-discretionary and "must be invoked absent extraordinary circumstances."  <u>Hunter</u>, 660 F. App'x at 714-15.  "<u>Younger</u> and its progeny require federal courts to abstain from exercising jurisdiction if (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state proceeding provides an adequate forum to hear the plaintiff's federal claims, and (3) the state proceeding involves important state interests."  <u>Hunter</u>, 660 F. App'x at 714 (citing <u>Amanatullah v. Colo. Bd. of Med. Exam'rs</u>, 187 F.3d at 1163).

8.     The Tenth Circuit applies the three <u>Sprint</u> categories within its analysis of the first

prong -- whether there are "ongoing state administrative proceedings."  Hunter, 660 F. App'x at

715. It explained that "[t]he first condition -- ongoing state administrative proceedings -- involves

two subparts: the proceedings must be *ongoing* and they must be the *type* of proceedings afforded

Younger deference," where the three Sprint categories define "type."  Hunter, 660 F. App'x at 715

(emphasis in the original).  See Hunter, 660 F. App'x. at 716 ("As for the *type* of proceeding, the

Supreme Court has held that Younger applies to 'particular state civil proceedings that are akin to

criminal prosecutions.'")(emphasis in the original)(quoting Sprint, 134 S. Ct. at 588).

9.      Once a court determines that the case is appropriate for Younger abstention, a court

must then analyze the second and third elements: (ii) involvement of important state interests; and

(iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.

See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432)); Sw. Air

Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001).  When all three

elements mandating abstention clearly exist in the record, courts may and should address Younger

abstention doctrine's analysis sua sponte.   See Bellotti v. Baird, 428 U.S. 132, 143 n.10

(1976)("Abstention may be raised by the court sua sponte.");  Morrow v. Winslow, 94 F.3d 1386,

1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and

holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

10.     Younger abstention is not discretionary once its criteria are met.  See Taylor v.

Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger

doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the

district court to exercise.").  When the Younger abstention elements are met, a district court should

dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in

the state proceeding," in which case the district court should stay the federal proceedings pending

the conclusion of the state litigation.  <u>Deakins v. Monaghan</u>, 484 U.S. 198, 202 (1988).  For

example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request

for equitable relief from a state court proceeding, a federal district court should dismiss the claims

for equitable relief under <u>Younger</u>, but stay the complaint with respect to the damages claim,

because § 1983 is a federal cause of action.  <u>See</u> <u>Myers v. Garff</u>, 876 F.2d 79, 81 (10th Cir.

1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief,

but that the district court should have stayed claims for damages under § 1983 against defendants

until the state court proceedings ended).  <u>See</u> <u>also</u> <u>Younger</u>, 401 U.S. at 43 (holding that the federal

courts must dismiss suits requesting declaratory or injunctive relief when there are pending state

criminal proceedings).

      11.     On the other hand, where a State court can address a plaintiff's cause of action, a

federal court should abstain and dismiss the case even if the plaintiff requests monetary damages

in addition to injunctive relief against the State court proceeding.  In <u>Wideman v. Colorado</u>, 242

F. App'x 611 (10th Cir. 2007)(unpublished), the Tenth Circuit considered a parent's complaints

alleging ongoing violations arising from the Colorado state courts' adjudication of his child

custody rights.  <u>See</u> 242 F. App'x at 613.  The parent had requested a federal district court to issue

an order regarding his parental rights and right to child support payments, and to award the parent

monetary damages compensating him for his past child support payments.  <u>See</u> 242 F. App'x at

611.  Additionally, the parent alleged that the Colorado State trial and appellate courts had treated

him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal

court seeking money damages from the State court officials adjudicating his State custody case.

242 F. App'x at 613.  The Tenth Circuit ruled that the district court was right to abstain from

hearing the parent's case under <u>Younger</u>.  <u>See</u> <u>Wideman v. Colorado</u>, 242 F. App'x at 614.  The

Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614. Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigate any federal constitutional issues that may arise . . . in the Colorado state proceedings."  242 F. App'x at 614.  Thus, where the <u>Younger</u> abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing. 242 F. App'x at 614.

12.      According to the Tenth Circuit, ordinarily, a state proceeding is no longer "ongoing" when  "the time for appeal has run."  <u>Hunter</u>, 660 F. App'x at 715 (citing <u>Bear v. Patton</u>, 451 F.3d 639, 642 (10th Cir. 2006)("[I]f a lower state court issues a judgment and the losing party allows the time for appeal to expire, then the state proceedings have ended.")).  "[R]egardless of when [a state court's] judgment became final, . . .  a necessary concomitant of <u>Younger</u> is that a party in [the federal plaintiff's] posture must exhaust his state appellate remedies before seeking relief in the [federal] District Court . . . ."  <u>Hunter</u>, 660 F. App'x at 715 (quoting <u>Huffman v. Pursue, Ltd.</u>, 420 U.S. 592, 608 (1975)).

### **LAW REGARDING 42 U.S.C. § 1983 CLAIMS**

13.      § 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. § 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1197 (10th Cir. 1998))). § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988). The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

14.     The Supreme Court clarified that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. Consequently, there is no respondeat superior liability under § 1983. See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[7] and

---

[7]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), the Supreme Court of the United States held that a violation of the Fourth

§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

15.    The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft

_____

Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.  Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit has noted, however, that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

16.     The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'"  Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

**LAW REGARDING 42 U.S.C. § 1988**

17.     § 1983 "and its fee-shifting provision, 42 U.S.C. § 1988, seek to encourage attorneys to litigate civil rights violations."   Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *13 (D.N.M. June 13, 2012)(Browning, J.).   Section 1988(b) provides: "[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."   42 U.S.C. § 1988(b).   "[T]here are two elements in deciding whether to award attorney's fees.   First, the party seeking fees must qualify as a 'prevailing party.'   Second, the fee itself must be 'reasonable.'"   Phelps v. Hamilton, 120 F.3d 1126, 1129 (10th Cir. 1997)(quoting 42 U.S.C. § 1988(b)).

18.     For the purpose of determining attorney's fees, a court may determine that plaintiffs are "prevailing parties . . . if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."   Hensley v. Eckerhart, 461 U.S. at 433 (internal quotation marks omitted)(citation omitted).   In Farrar v. Hobby, 506 U.S. 103 (1992), the Supreme Court later elaborated on this description:

> Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.   The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement.   Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement.   Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff.   Only under these circumstances can civil rights litigation effect the material alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party.   In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

506 U.S. at 111 (citations omitted)(internal quotation marks omitted)(alterations omitted).   The Supreme Court has stated that "this is a generous formulation that brings the plaintiff only across the statutory threshold."   Hensley v. Eckerhart, 461 U.S. at 433.   See Copar Pumice Co., Inc. v.

Morris, 2012 WL 2383667, at *19 (concluding that Copar Pumice qualified as a prevailing party under the "generous formulation" that the Supreme Court set in Hensley v. Eckerhart).  The district court must then determine what fee is "reasonable."  Hensley v. Eckerhart, 461 U.S. at 433; Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d 1188, 1210 (D.N.M. 2011)(Browning, J.)("Once a court determines that a party is a prevailing party, it must then determine what amount of reasonable attorney's fees should be awarded.").

19.     "To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate." Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)(citing Blum v. Stenson, 465 U.S. at 888; Hensley v. Eckerhart, 461 U.S. at 433).  This lodestar figure "provides an objective basis on which to make an initial estimate of the value" of an attorney's services. Hensley v. Eckerhart, 461 U.S. at 433.  While the Court "agrees that attorneys' fees should be adequate to attract competent counsel," they should "not be so large that it is a windfall for attorneys -- who should not be encouraged to grow fat off of lackluster cases, or pester the court with trifles in the hopes of capturing large attorneys' fees from dubious claims." Obenauf v. Frontier Financial Group, Inc., 785 F. Supp. 2d at 1214.  The prevailing party requesting an award of its fees must submit evidence to support its claim of time spent and rates claimed.  See Hensley v. Eckerhart, 461 U.S. at 434.  If the evidence is inadequate, the district court may reduce the fee award accordingly.  See Hensley v. Eckerhart, 461 U.S. at 434. See also Ysasi v. Brown, 2015 WL 403930, at *14 (reducing the plaintiffs' counsel's requested fees because the time records were of poor quality, lacked detail, and were general in their wording).

20.     A district court may also adjust the lodestar to reflect a plaintiff's overall success level.  See Jane L. v. Bangerter, 61 F.3d at 1511 (citing Hensley v. Eckerhart, 461 U.S. at 435-36).

"In making such adjustments, however, <u>Hensley</u> requires that lower courts make qualitative comparisons among substantive claims before adjusting the lodestar either for excellent results or limited success." <u>Jane L. v. Bangerter</u>, 61 F.3d at 1511.  The district court must consider the relationship between the fees awarded and the degree of success obtained and must make a qualitative assessment to determine when limited results will nonetheless justify full recovery or to what extent a plaintiff's "limited success" should reduce the lodestar.  <u>Jane L. v. Bangerter</u>, 61 F.3d at 1511.  "There is no precise rule or formula" for making such determinations.  <u>Hensley v. Eckerhart</u>, 461 U.S. at 436.  In <u>Hensley v. Eckerhart</u>, the Supreme Court explained the rationale behind this approach:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims.  Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

461 U.S. at 435.

21.     Furthermore, when a plaintiff brings related claims, failure on some claims should not preclude full recovery if the plaintiff achieves success on a significant, interrelated claim.  <u>See Hensley v. Eckerhart</u>, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."); <u>Jane L. v. Bangerter</u>, 61 F.3d at 1512.  Claims are related when they are either based on "a common core of facts" or based on "related legal theories." <u>Hensley v. Eckerhart</u>, 461 U.S. at 435.  In both cases, the district court should refrain from reducing the amount of the prevailing party's attorney's fee award.  <u>See Jane L. v. Bangerter</u>, 61 F.3d at 1512.  The Tenth Circuit has "refused to permit the reduction of an attorneys fee request if successful and unsuccessful claims are based on a common core of facts."  <u>Jane L. v. Bangerter</u>,

61 F.3d at 1512 (internal quotation marks omitted)(quoting <u>Tidwell v. Fort Howard Corp.</u>, 989 F.2d 406, 412-13 (10th Cir. 1993)(holding that the trial court abused its discretion in reducing attorney's fees for a plaintiff who prevailed under some provisions of the Equal Pay Act, but failed on her Title VII and state law claims)).  The Tenth Circuit has also recognized that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee."  <u>Jane L. v. Bangerter</u>, 61 F.3d at 1512 (quoting <u>Hensley v. Eckerhart</u>, 461 U.S. at 435).

## LAW REGARDING PRELMINARY INJUNCTIONS

22.     "It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."  <u>Kikumura v. Hurley</u>, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  <u>N. Cal. Power Agency v. Grace Geothermal Corp.</u>, 469 U.S. 1306, 1306 (1984).  Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."  <u>Resolution Trust Corp. v. Cruce</u>, 972 F.2d 1195, 1198 (10th Cir. 1992). See <u>Winter</u>, 555 U.S. at 19 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely

to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing <u>Munaf v. Geren</u>, 553 U.S. 674, 688-89 (2008))). The movant bears the burden of demonstrating all four prongs' satisfaction. <u>See Automated Mktg. Sys., Inc. v. Martin</u>, 467 F.2d 1181, 1183 (10th Cir. 1972). "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." <u>Diné</u>, 839 F.3d at 1282. "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'" <u>Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.</u>, 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting <u>Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.</u>, 269 F.3d 1149, 1156 (10th Cir. 2001)(citing <u>Kikumura v. Hurley</u>, 242 F.3d at 963) ). "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." <u>Logan v. Pub. Emps. Ret. Ass'n</u>, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing <u>Schrier v. Univ. of Colo.</u>, 427 F.3d 1253, 1266 (10th Cir. 2005).

23.     "[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'" <u>Schrier v. Univ. of Colo.</u>, 427 F.3d at 1258 (quoting <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. at 395). In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." <u>Schrier v. Univ. of Colo.</u>, 427 F.3d at 1258 (internal

quotation marks omitted)(quoting <u>O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 975 (10th Cir. 2004), <u>aff'd and remanded sub nom.</u> <u>Gonzales v. O CenPI Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418 (2006)("<u>O Centro</u>")).   <u>Accord</u> <u>Westar Energy, Inc. v. Lake</u>, 552 F.3d 1215, 1224 (10th Cir. 2009).   Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" <u>Schrier v. Univ. of Colorado</u>, 427 F.3d at 1261 (all alterations but first in <u>Schrier v. Univ. of Colo.</u>)(quoting <u>O CenPI [II]</u> . . . , 389 F.3d at 979).  The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, <u>i.e.</u>, that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

<u>Salazar v. San Juan Cty. Det. Ctr.</u>, 2016 WL 335447, at *40.   When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."   <u>SCFC ILC, Inc. v. Visa USA, Inc.</u>, 936 F.2d 1096, 1100 (10th Cir. 1991), <u>overruled on other grounds by</u> <u>O Centro</u>, 389 F.3d at 975).   "The meaning of this category is self-evident."   <u>Salazar v. San Juan Cty. Det. Ctr.</u>, 2016 WL 335447, at *41.   With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued."   <u>Salt Lake Tribune Publ'g Co. v. AT & T Corp.</u>, 320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting <u>SCFC ILC, Inc. v. Visa USA, Inc.</u>, 936 F.2d at 1098-99).

24.     "[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]"  United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)).  See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available).  Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy.  See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## **LAW REGARDING BONDS FOR PRELIMINARY INJUNCTIONS**

25.     Under rule 65(c), the Court may issue a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States and its officers and agencies are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable").  See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

## RELEVANT LAW REGARDING THE FIRST AMENDMENT

26.     The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  The First Amendment secures the "freedom of expression upon public questions."  New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964).  According to Justice Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary."  Whitney v. California, 274 U.S. 357, 375 (1927).  The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be the secret of liberty."  Whitney v. California, 274 U.S. at 375.  The Framers firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile."  Whitney v. California, 274 U.S. at 375.  Justice Brandeis noted that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates.  See Whitney v. California, 274 U.S. at 375.  Robust public discussion is a "political duty" and is a "fundamental principle of the American government."  Whitney v. California, 274 U.S. at 375.  Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people."  Roth v. United States, 354 U.S. 476, 484 (1957).

27.     The First Amendment, however, is not an absolute bar on government intervention.  "No law," does not actually mean "no law."  U.S. Const. amend. I.  See Dennis v. United States, 314 U.S. 494, 503 (1951)(noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to

other values and considerations"); Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)(stating that, "'[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content," but "this principle, like other First Amendment principles, is not absolute")(quoting Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65 (1983)).  Although the First Amendment speaks in absolutist terms, courts have long recognized that governments constitutionally can restrict speech and the press under certain conditions.  See Holder v. Humanitarian Law Project, 561 U.S. 1, 26-29 (2010).  Justice Oliver Wendell Holmes, Associate Justice of the Supreme Court of the United States of American, notes in his famous example: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic."  Schenck v. United States, 249 U.S. 47, 52 (1919).  Not all speech is protected speech.  See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); Miller v. California, 413 U.S. 15, 23 (1973)("This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment."). "[N]ot all speech is of equal First Amendment importance."  Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985).  The extent to which the government may limit access to information or restrict speech "depends on the nature of the forum."  Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)(concluding that certain content-neutral time, place, and manner restrictions are constitutional).  Moreover, the First Amendment's speech and press protections limit both state and federal government action.  See Gitlow v. New York, 268 U.S. 652, 666 (1925); Near v. Minnesota, 283 U.S. 697, 628 (1931).  The First Amendment regulates "government regulation of

private speech" and not government speech or purely private speech regulations.  Pleasant Grove

City, Utah v. Summum, 555 U.S. 460, 467 (2009).  The First Amendment does not compel either

the government or private persons to supply information.  See Shero v. City of Grove, 510 F.3d

1196 (10th Cir. 2007).  See In re Santa Fe Natural Tobacco Co. Mkting & Sales Practices and

Products Liab. Litig., 388 F. Supp. 3d 1087, 1168-73 (D.N.M. Dec. 21, 2017)(Browning, J.).

     1.    **Access to Court Proceedings and the First Amendment.**

     28.    The First Amendment does not mention explicitly a right of access to court

proceedings.  See U.S. Const. amend. I.  Nevertheless, the Supreme Court has extended a public

right of access to criminal trials pursuant to the First Amendment.  See Globe Newspaper Co. v.

Superior Court for Norfolk Cnty., 457 U.S. 596, 602-04 (1982).  The Supreme Court states:

> [W]e have long eschewed any "narrow, literal conception" of the First
> Amendment's terms . . . for the Framers were concerned with broad principles, and
> wrote against a background of shared values and practices.  The First Amendment
> is thus broad enough to encompass those rights that, while not unambiguously
> enumerated in the very terms of the Amendment, are nonetheless necessary to the
> enjoyment of other First Amendment Rights.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 603-04 (quoting NAACP

v. Button, 371 U.S. 415, 430 (1963)).  See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555,

579-80, 591 n.16 (1980).  The Supreme Court has emphasized that the right of access to criminal

trials is important, because "the criminal trial has historically been open to the press and general

public," and because such public access "plays a particularly significant role in the functioning of

the judicial process and the government as a whole."  Globe Newspaper Co. v. Superior Court for

Norfolk Cnty., 457 U.S. at 605-06.  Accordingly,

> Public scrutiny of a criminal trial enhances the quality and safeguards the integrity
> of the factfinding process, with benefits to both the defendant and to society as a
> whole. Moreover, public access to the criminal trial fosters an appearance of
> fairness, thereby heightening public respect for the judicial process.  And in the

broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process -- an essential component in our structure of self-government.  In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  Because one of the First Amendment's "major purpose[s]" is to "protect the free discussion of governmental affairs," the Supreme Court recognizes a right of access to criminal trials.  Mills v. Alabama, 384 U.S. 214, 218 (1966).  By protecting this right, the First Amendment "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 604.  The Supreme Court cautions, however, that, "although the right of access to criminal trials is of constitutional stature, it is not absolute."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606. Still, the standard that the government must meet to garner closure is hefty, requiring satisfaction of strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606-07.

29.     The First Amendment does not protect an absolute right to access court documents or court proceedings.  See Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. 1, 11-12 (1986); Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606. The right is not absolute, because, as the Supreme Court notes, it takes "little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly."  Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8.  "[T]he right to inspect and copy judicial records is not absolute."  Nixon v. Warner Commc'n, Inc., 435 U.S. 589, 598 (1978).  The Supreme Court states: "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a

vehicle for improper purposes." <u>Nixon v. Warner Commc'n, Inc.</u>, 435 U.S. at 598.  Consequently, there is a "qualified" "right of public access" if two "considerations of experience and logic" are met.  <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S. at 10.  First, a judicial proceeding or record must "have historically been open to the press and general public." <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S. at 8.  Second, public access must play a "significant positive role in the functioning of the particular process in question." <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S. at 8.  The right of access is qualified, but the presumption of access may be overcome "'only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S. at 9 (quoting <u>Press-Enterprise Co v. Superior Ct. of Calif., Riverside Cnty.</u>, 464 U.S. 501, 510 (1984)).  <u>See</u> <u>United States v. Gonzales</u>, 150 F.3d 1246, 1256 (10th Cir. 1998)).  This test is known as the "experience and logic" test.  <u>See</u> <u>Lanphere & Urbaniak v. Colo.</u>, 21 F.3d 1508, 1512 (10th Cir. 1994).

30.     The "experience and logic" test does not afford the press a special right of access to court or government documents not available to the public.  <u>See</u> <u>Lanphere & Urbaniak v. Colo.</u>, 21 F.3d 1511.  The United States Court of Appeals for the Tenth Circuit has twice assumed without deciding that the "experience and logic" test applies to non-criminal court records and proceedings. <u>See</u> <u>United States v. McVeigh</u>, 119 F.3d 806, 812 (10th Cir. 1997); <u>United States v. Gonzales</u>, 150 F.3d at 1256.  In doing so, however, the Tenth Circuit reiterated that there is "not yet any definitive Supreme Court ruling on whether there is a constitutional right of access to court documents and, if so the scope of such a right." <u>United States v. McVeigh</u>, 119 F.3d at 812.

31.     The "experience and logic" test does not require disclosure of a criminal defendant's address or telephone number.  Lanphere & Urbaniak v. Colo., 21 F.3d at 1512.  In Lanphere & Urbaniak v. Colo., the Tenth Circuit concluded that a First Amendment right of access exists only in "limited situations" where a "'tradition of accessibility implies the favorable judgment of experience' . . . and where 'public access plays a significant positive role in the functioning of the particular process in question.'"  Lanphere & Ubraniak v. Colo., 21 F.3d at 1512 (quoting Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8).  Allowing access to documents that contain a defendant's "address and/or phone number," especially when those documents are sought for that reason specifically, would stretch the First Amendment's principles "well beyond their current bounds."  See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512.  The Tenth Circuit, therefore, notes specifically that it "declines" to find a First Amendment right to access to court documents which contain a criminal defendant's address or telephone number.  See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512.  See also United States v. Jager, No. CR-1531 JB, 2011 WL 13285416, at *4 (D.N.M. June 23, 2011)(Browning, J.)("[T]he 'interests of personal privacy' of the innocent third parties is 'sufficiently compelling to overcome the presumption of access.'"  United States v. Jager, No. CR-1531 JB, 2011 WL 13285416, at *4 (D.N.M. June 23, 2011)(Browning, J.)(quoting United States v. Sattar, 471 F. Supp. 2d 380, 388 (S.D.N.Y. Nov. 21, 2006)(Koeltl, J.)).

32.     Similarly, the "experience and logic" test does not mandate press access to suppressed evidence.  United States v. McVeigh, 119 F.3d at 812-13.  Assuming without deciding that the "experience and logic" test applies beyond the criminal context, the Tenth Circuit determined that, although there is a "qualified right of access" to a suppression motion, that right "does not extend to the evidence actually ruled inadmissible in such a hearing."  United States v.

McVeigh, 119 F.3d at 813.  The public's interest in understanding court proceedings is the guiding principle.  See United States v. McVeigh, 119 F.3d at 813.  The Tenth Circuit reasoned that accessing suppressed evidence is "not necessary to understand the suppression hearing, so long as the public is able to understand the circumstances that gave rise to the decision to suppress." United States v. McVeigh, 119 F.3d at 813.  Moreover, the Tenth Circuit noted that disclosing suppressed evidence would harm the criminal process, because it would expose the "public generally, as well as potential jurors, to incriminating evidence that the law has determined may not be used to support a conviction." United States v. McVeigh, 119 F.3d at 813.  A district court's decision to seal only "those portions of the motion and exhibit that contain materials . . . ruled inadmissible," therefore, did not run afoul of the First Amendment, because "both the press and the public had ample opportunity to understand the circumstances surrounding" the inadmissible material.  United States v. McVeigh, 119 F.3d at 813-14.

33.     The First Amendment does not require that the press have access to Criminal Justice Act, 18 U.S.C. § 3006A, ("CJA") materials, including "CJA-related vouchers, backup documentation, motions, orders, and hearing transcripts."  United States v. Gonzales, 150 F.3d 1246, 1253 (10th Cir. 1998).  When the Albuquerque Journal contended that it has a First Amendment right to access CJA materials, the Tenth Circuit applied the "experience and logic" test, and concluded that neither history nor logic supported the Albuquerque Journal's contention. United States v. Gonzales, 150 F.3d at 1256-61.  First, there is "no history, experience or tradition of access" requiring the "release at any time of backup documentation, motions, orders, and hearing transcripts regarding requests for CJA assistance."  United States v. Gonzales, 150 F.3d at 1258.  Second, public access to these records does not "play a *significant role* in the functioning of the CJA process" and would, in fact, play "a *negative* role."  United States v. Gonzales, 150

F.3d at 1259 (emphasis in original).  Further, the Tenth Circuit concluded that there is no common-law right of access to CJA materials, because the CJA statutory scheme would supersede any common-law right.  See United States v. Gonzales, 150 F.3d at 1263.

34.     Neither the Supreme Court nor the Tenth Circuit has decided that Press-Enterprise Co's "experience and logic" test applies to civil complaints.  Moreover, if restriction on public access to a government document or record is not a complete bar, but instead resembles a "time, place, and manner" restriction, then a court does not apply strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 607 n.17.  Time, place, and manner restrictions on press access to court documents are constitutional where they are "content-neutral, narrowly tailored, and necessary to preserve the court's important interest in the fair and orderly administration of justice."  Courthouse News Serv. v. Planet, 947 F.3d 581, 585 (9th Cir. 2020).  See Ward v. Rock Against Racism, 491 U.S. at 791 (concluding that content-neutral time, place, and manner restrictions are constitutional if they are narrowly tailored to serve a significant government interest, and leave open ample room for the information to be communicated other ways).

35.     Where the "experience and logic" test is satisfied -- and, therefore, there is a First Amendment right to access -- there is a necessary "right to timely access."  Courthouse News Serv. v. Planet, 947 F.3d at 594.  The right to timely access does not swallow the entire time, place, and manner analysis.  See Courthouse News Serv. v. Planet, 947 F.3d at 594.  As a result, a right to access timely information does not entitle the press to "immediate, pre-processing access to newly filed complaints."  Courthouse News Serv. v. Planet, 947 F.3d at 594.  See Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021)(concluding that the First Amendment "does not require perfect or instantaneous access").  The qualified right "attaches when the complaint is

filed," but does "not entitle the press to immediate access to those complaints." <u>Courthouse News Serv. v. Planet</u>, 947 F.3d at 585.  The Ninth Circuit states:

> Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged.  After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration.  The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

<u>Courthouse News Serv. v. Planet</u>, 947 F.3d at 596.  The qualified right of access does "not require perfect or instantaneous access," because it leaves room for courts to delay access when "same-day access would be impracticable." <u>Courthouse News Serv. v. Schaefer</u>, 2 F.4th at 328.  Neither "inconsequential delays" nor delays caused by "extraordinary circumstances" infringe the qualified right of access. <u>Courthouse News Serv. v. Schaefer</u>, 2 F.4th at 328.  Rather, the First Amendment requires newly filed civil complains be available "as expeditiously as possible." <u>Courthouse News Serv. v. Schaefer</u>, 2 F.4th at 329.  For example, "overnight delay in access to complains filed during the last ninety minutes of the court's public hours" does not violate the First Amendment. <u>Courthouse News Serv. v. Planet</u>, 947 F.3d at 599.

## 2. <u>Newsgathering and the First Amendment.</u>

36.     While newsgathering has some First Amendment protection, its protection does not include necessarily a right to access all news-worthy information.  The Supreme Court has noted that, although "there is an undoubted right to gather news 'from any source by means within the law,'" that right is limited, by its terms, to the ability to gather information from sources legally that are legally available to the public. <u>Houchins v. KQED, Inc.</u>, 438 U.S. 1, 10-12 (1978)(quoting <u>Branzburg v. Hayes</u>, 408 U.S. 665, 681-82 (1972)).  "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public

generally." Branzburg v. Hayes, 408 U.S. at 684.  First Amendment protection of newsgathering, which ensures that the government does not "violate the First Amendment by deterring news sources from communicating information," does not provide a right of access beyond the public's general access to a particular source.  Houchins v. KQED, Inc., 438 U.S. at 10-12 (citing Branzburg v. Hayes, 408 U.S. at 680).  Thus, there is "no basis for the claim that the First Amendment compels others -- private persons or governments -- to supply information."[8]  Houchins v. KQED, Inc., 438 U.S. at 10-11.

37.     The Supreme Court has also found that an international passenger who asserted that the Secretary of State's refusal to validate his passport to travel to Cuba violated his First Amendment right to "travel abroad" so as to acquaint himself "first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies," had not suffered a First Amendment violation.  Zemel v. Rusk, 381 U.S. 1, 16-17 (1965).  The Supreme Court explained:

There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.  For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment

---

[8]As the Tenth Circuit has noted:

[T]he "Supreme Court has recognized that the First Amendment guarantees access to government records pertaining to criminal proceedings if (1) there has been a tradition of access to the information and (2) public access benefits the functioning of the particular process in question.  See, e.g., Press–Enter. Co. v. Superior Court, 478 U.S. 1, 8 . . . (1986)(finding a conditional right of access to California pre-trial criminal proceedings).  Cf. Journal Pub. Co. v. Mechem, 801 F.2d 1233, 1236-37 (10th Cir.1986)(applying a similar analysis to coverage of certain aspects of a civil trial)."

Smith v. Plati,  258 F.3d 1167, 1178 n.10 (10th Cir. 2001).

right.  The right to speak and publish does not carry with it the unrestrained right to gather information.

Zemel v. Rusk, 381 U.S. at 16-17.

38.     According to the Tenth Circuit, it is "well-settled  that  there  is  no  general  First Amendment right of access to all sources of information within governmental control."  Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)(citing Houchins v. KQED, Inc., 438 U.S. 1, 9 (1978)). "This applies equally to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the public."  Smith v. Plati, 258 F.3d at 1178 (citing Houchins v, KQED, Inc., 438 U.S. at 11; Pell v. Procunier, 417 U.S. 817, 834 (1974); Saxbe v. Wash. Post Co., 417 U.S. 843, 850 (1974); Branzburg v. Hayes, 408 U.S. at 684-85; and Zemel v. Rusk, 381 U.S. at 17).  See Okla. Hosp. Ass'n v. Okla. Pub. Co., 748 F.2d 1421, 1425 (10th Cir. 1984)("Thus, the Supreme Court has recognized that, whatever the extent of protection warranted newsgathering, it is no greater than the right of the general public to obtain information." (citing Pell v. Procunier, 417 U.S. at 834)).

## ANALYSIS

As a threshold matter, the Court determines that Younger abstention is not appropriate in this case under Tenth Circuit precedent.  Next, the Court concludes that Courthouse News has a qualified right of timely access to newly filed non-confidential civil complaints, which attaches when a complaint is filed, or submitted, to the State courts.  The Court defines the right of timely access by looking at what access was traditionally provided to the press in the days of paper filing, because the right of timely access is based on history and experience, and concludes that a limit of five business hours comes the closest to replicating traditional access in the paper filing system. The Court applies "more relaxed" scrutiny in determining whether the right of timely access has

been violated.  Courthouse News Serv. v. Planet, 947 F.3d at 595.  Based on data submitted and testimony provided by both parties at the hearing, the Court concludes that the Defendants have likely violated Courthouse News' right of timely access.  Because Courthouse News is likely to succeed on the merits of a traditional right of access claim, it is appropriate to grant Courthouse News' preliminary injunction insofar as it enjoins the Defendants from denying access to newly filed civil complaints past five business hours.

I.      **THE COURT WILL NOT ABSTAIN UNDER YOUNGER BECAUSE THE REQUESTED INJUNCTION WOULD NEITHER INTERFERE WITH NOR ENJOIN AN ONGOING STATE PROCEEDING.**

The Defendants suggest that, because the Supreme Court of New Mexico's Order No. 17-8500-001 is an ongoing, standing order, there is an "ongoing state proceeding" for Younger abstention purposes.  Response at 11.  For the Court to abstain under Younger, this proceeding: (i) must interfere with an ongoing state judicial proceeding; (ii) must involve important state interests; and (iii) the state proceeding must provide an adequate opportunity to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78).  See also Bellotti v. Baird, 428 U.S. at 143 n.10 (noting that if all three conditions mandating abstention exist clearly in the record, courts should address Younger abstention sua sponte); Morrow v. Winslow, 94 F.3d at 1390-91 & n.3.  Before examining the three-factor test, the Court first must address whether Younger abstention is applicable.  Circumstances warranting Younger abstention are "'exceptional'" and include "'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  Sprint, 581 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368).

- 71 -

Asking whether <u>Younger</u> requires abstaining is appropriate here.  <u>Sprint</u>'s third category is most relevant.  <u>Sprint</u> notes that <u>Younger</u> abstention may be appropriate in "'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  <u>Sprint</u>, 581 U.S. at 73 (quoting <u>New Orleans Pub. Serv., Inc. v. Council of City of New Orleans</u>, 491 U.S. at 368).  Courthouse News' Complaint is aimed squarely at New Mexico state courts' operational procedures that carry out judicial functions, and not at New Mexico courts' ability to perform judicial functions.  An injunction would affect New Mexico's entire court system -- not just one state court proceeding -- because it may require changes to the State's e-filing software, or may require the State to hire additional staff to more quickly process documents.  Either way, an injunction would alter the operating procedures of clerks across the State.  As a result, this case's circumstances befit considering <u>Younger</u> abstention.  See <u>Sprint</u>, 581 U.S. at 73.

This case does not "interfere with an ongoing state judicial proceeding."  <u>J.B. ex rel. Hart v. Valdez</u>, 186 F.3d at 1291.  The Tenth Circuit recently emphasized that "<u>Younger</u> does not mechanically require abstention whenever a state court conducts contempt proceedings in a related matter.  Rather . . . the 'exceptional circumstances' requiring abstention under <u>Younger</u>'s third category are present only when the relief requested from the federal court would enjoin or otherwise interfere with such proceedings."  <u>Elna Sefcovic, LLC v. TEP Rocky Mountain</u>, LLC, 953 F.3d 660, 672 (10th Cir. 2020)(citing <u>ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund</u>, 754 F.3d 754, 759 (9th Cir. 2014)(stating that <u>Younger</u> abstention is appropriate only if "the federal action would have the practical effect of enjoining the state proceedings").  As the United States Court of Appeals for the Seventh Circuit notes in <u>Courthouse News Serv. v. Brown</u>, 908 F.3d 1063 (7th Cir. 2018)("<u>Brown</u>"), "[t]he situation here is not a traditional <u>Younger</u> scenario: there is no

individual, ongoing state proceeding that plaintiffs seek to enjoin." Brown, 908 F.3d at 1072.  As in Brown, Courthouse News seeks an injunction requiring court clerks to release newly filed complaints to the press at the moment they are submitted to the Court, but before the clerks process them and before the New Mexico courts deem them to be "accepted."  Complaint at 21.  See Brown, 908 F.3d at 1065.  Courthouse News' requested injunction would neither interfere with nor enjoin the substance or merits of any one particular state proceeding; rather, it would speed up press and public access to the documents -- civil complaints in particular -- through which all state proceedings happen.  Because Courthouse News does not seek to interfere with the substance of even a single state court proceeding, an injunction affecting only the speed of the State's processing of civil complaints would not "interfere with an ongoing state judicial proceeding."  J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291.  See ReadyLink HealthCare, Inc. v. State Compensation Ins. Fund, 754 F.3d at 759 (stating that that Younger abstention is appropriate only if "the federal action would have the practice effect of enjoining the state proceedings").

Because the Court concludes that the requested injunction would not interfere with an ongoing state judicial proceeding, it need not address whether the state proceeding involves important state interests or whether it provides an adequate opportunity to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291.  The Court acknowledges, however, that the State has a legitimate interest in regulating and operating its statewide e-filing system "to ensure the protection of the litigants and the smooth operation of the judiciary."  Response at 2.  Similarly, New Mexico State courts would afford "an adequate opportunity . . . to raise the federal claims," J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291, and Girdner's "belie[f that] it would be futile" to raise Courthouse News' claims in State court in New Mexico, because "it would be asking the same court system that is denying the access to turn around and say that that denial is

unconstitutional," Tr. 41:9-12 (Girdner) is not enough to come to federal district court rather than state court. Being unsuccessful does not mean that the State does not provide an adequate forum for Courthouse News' claims.

Analyzing a similar issue, the Seventh Circuit in Brown decided that Younger abstention is appropriate. See Brown, 908 F.3d at 1073. Relying on SKS & Associates, Inc. v. Dart, 619 F.3d 674 (7th Cir. 2010), the Seventh Circuit declined to exercise jurisdiction and interfere with state-court filing processes. See Brown, 908 F.3d at 1073. The Seventh Circuit notes that it is

> important for federal courts to have "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief the National Government will fare best if the States and their institutions are left free to perform their separate function in their separate ways."

Brown, 908 F.3d at 1073 (quoting SKS & Associates, Inc. v. Dart, 619 F.3d at 676). In particular, the Seventh Circuit states that Younger relies on a "deeper principle of comity: the assumption that state courts are co-equal to the federal courts and are fully capable of respecting and protecting [Courthouse News'] substantial First Amendment rights." Brown, 908 F.3d at 1074. According to the Seventh Circuit, this principle "takes on special force" when, as here, a federal court is "asked to decide how state courts should conduct their business." Brown, 908 F.3d at 1074. Also analyzing a similar issue, but without a case from the United States Court of Appeals for the Eight Circuit analogous to SKS & Associates, Inc. v. Dart, 619 F.3d 674, the Honorable Henry E. Autrey, United States District Judge for the United States District Court for the Eastern District of Mississippi, agreed with the Seventh Circuit and chose to abstain. See Courthouse News Serv. v. Gilmer, -- F. Supp. 3d --, 2021 WL 2438914, at *8 (E.D. Mo. June 15, 2021)(Autrey, J.).

The Court does not agree with the Seventh Circuit's conclusion. The Seventh Circuit is correct that State courts are capable of protecting First Amendment rights. See Tafflin v. Levitt,

493 U.S. 455, 458 (1990).  The Seventh Circuit is also correct that State courts do and should have discretion to conduct their own business as they see fit.  These considerations, however, do not outweigh a federal courts' authority "to say what the law is."  Marbury v. Madison, 5 U.S. 137, 178 (1803).  Moreover, the Seventh Circuit's conclusion does not square with the Tenth Circuit's treatment of Younger -- the Tenth Circuit has no analogue to SKS & Associates, Inc. v. Dart, 619 F.3d 674.  Federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress," so, in the absence of a congressional directive, federal courts should not decline lightly to carry out their obligation.  Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996).  The Seventh Circuit's reasoning, therefore, is better directed at Courthouse News than at federal courts, because Courthouse News could easily have filed this same action in the New Mexico courts.  Courthouse News chose to file in federal court, however.

The Court is also mindful of the Seventh Circuit's concerns about federal-court oversight of state procedures.  The Seventh Circuit noted that, while not directly on point, the Supreme Court's reasoning in O'Shea v. Littleton, 414 U.S. 488 (1974), and Rizzo v. Goode, 423 U.S. 362 (1976), is instructive.  See Brown, 908 F.3d at 1071-73.  In particular, the Court is aware that the Supreme Court cautions against injunctions that might lead to "an ongoing federal audit of state . . . proceedings which would indirectly accomplish the kind of interference that" Younger "sought to prevent."  O'Shea v. Littleton, 414 U.S. at 500.  Here, however, there is little risk of an "ongoing federal audit" or "a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state . . . proceedings."  O'Shea v. Littleton, 414 U.S. at 500, 502.  See Courthouse News Serv. v. Planet, 750 F.3d at 792.

Younger does "not mechanically require abstention," even when State courts are involved.  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 672 (10th Cir. 2020).  Because

Younger requires abstention only in "exceptional" circumstances, the Court is reluctant to attempt to expand Younger to require abstention whenever a State institution is alleged to have acted unconstitutionally.  Sprint, 571 U.S. at 73.  The Court declines to extend Younger far enough to risk concluding that, whenever a State court is involved, the only federal court that can determine the legality or constitutionality of the State's procedure is the Supreme Court, or to risk creating an exception to both federal-question jurisdiction, see 28 U.S.C. § 1331, and the Supremacy Clause, see U.S. Const. art. VI cl. 2.  The Court, therefore, agrees with the Ninth Circuit's conclusion that an injunction requiring State courts to make civil complaints available more quickly to the press does not require abstention under Younger.  See Courthouse News Serv. v. Planet, 750 F.3d at 792.

## II.  THE STATE OF NEW MEXICO VIOLATES COURTHOUSE NEWS' RIGHT OF TIMELY ACCESS WHEN IT DOES NOT PROVIDE PRESS ACCESS TO NEWLY FILED NON-CONFIDENTIAL CIVIL COMPLAINTS WITHIN FIVE BUSINESS HOURS OF THEIR SUBMISSION.

Courthouse News has a qualified right under the First to access non-confidential civil complaints.  The First Amendment does not protect an absolute right to access court documents or court proceedings.  See Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. 1, 11-12 (1986)("Press-Enterprise II"); Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606; Nixon v. Warner Commc'n, Inc., 435 U.S. at 598 ("[T]he right to inspect and copy judicial records is not absolute.").  Under Press-Enterprise II, there is a "qualified" "right of public access" if two "considerations of experience and logic" are met.  Press-Enterprise II, 478 U.S. at 10.  First, a judicial proceeding or record must "have historically been open to the press and general public."  Press-Enterprise II, 478 U.S. at 8.  Second, public access must play a "significant positive role in the functioning of the particular process in question."  Press-Enterprise

II, 478 U.S. at 8.  The right of access is qualified, but the presumption of access may be overcome

"'only by an overriding interest based on findings that closure is essential to preserve higher values

and is narrowly tailored to serve that interest.'"  Press-Enterprise II, 478 U.S. at 9 (quoting Press-

Enterprise Co v. Superior Ct. of Calif., Riverside Cnty., 464 U.S. 501, 510 (1984)).  See United

States v. Gonzales, 150 F.3d 1246, 1256 (10th Cir. 1998)).  This test is known as the "experience

and logic" test.  Lanphere & Urbaniak v. State of Colo., 21 F.3d 1508, 1512 (10th Cir. 1994).

The Tenth Circuit has twice assumed without deciding that the "experience and logic" test

applies to non-criminal court records and proceedings.  United States v. McVeigh, 119 F.3d 806,

812 (10th Cir. 1997); United States v. Gonzales, 150 F.3d at 1256.  In assuming without deciding,

however, the Tenth Circuit reiterated that there is "not yet any definitive Supreme Court ruling on

whether there is a constitutional right of access to court documents and, if so the scope of such a

right."  United States v. McVeigh, 119 F.3d at 812.  Neither the Supreme Court nor the Tenth

Circuit has decided that Press-Enterprise II's "experience and logic" test applies to civil

complaints.

Here, Courthouse News has shown that access to newly filed non-confidential civil

complaints "ha[s] historically been open to the press and general public" under the first prong of

Press-Enterprise II's experience and logic test.  478 U.S. at 8.  The Court heard testimony from

witnesses for both Courthouse News and the Defendants that, before the advent of e-filing,

reporters accessed newly field complaints after they had been filed with the clerk of the court.  See

Girdner Decl. ¶ 12, at 5; Noel Decl. ¶ 5, at 3;  See Tr. at 52:22-53:8 (Prieskop);  See Tr. 45:7-13

(Girdner).  Girdner testified that Courthouse News began reporting in New Mexico around 2005.

See Tr. at 8:2-4 (Girdner).  Other courts have made similar findings: "[T]he district court found

that 'there is no dispute that, historically, courts have openly provided the press and general public

with access to civil complaints.'" <u>Courthouse News Serv. v. Schaefer</u>, 2 F.4th 318, 326 (4th Cir. 2021)(quoting <u>Courthouse News Serv. v. Schaefer</u>, 440 F. Supp. 3d 532, 557 (E.D. Va. 2020)). <u>See</u> <u>Courthouse News Serv. v. Glessner</u>, No. 1:21-cv-00040-NT, 2021 U.S. Dist. LEXIS 132894 at *37 (D. Me. July 16, 2021)(Torresen, J.)("The experience prong of the <u>Press-Enterprise</u> test supports a finding of a public right of access to civil complaints.").   The Court concludes that access to newly filed non-confidential civil complaints, therefore, historically has been open to the press and the general public.

Under the second prong, public access must play a "significant positive role in the functioning of the particular process in question."  <u>Press-Enterprise II</u>, 478 U.S. at 8.  The Court finds persuasive the description of the importance of public access to civil complaints by the Honorable Nancy Torresen, United States District Judge for United States District Court for the District of Maine:

> In a civil case, the complaint provides the subject matter of a filed lawsuit and sets the framework for all subsequent court action.  Allowing access to these initiating records allows the public to understand the litigation and puts the public in a position where it can evaluate the quality and honesty of the judiciary.  Such access therefore plays a significant positive role in the court system.

<u>Courthouse News Serv. v. Glessner</u>, 2021 U.S. Dist. LEXIS 132894 at *38.  The Court concludes that the public and the court system benefit not only from press access to newly-filed complaints, but also from press reporting on subsequent filings and the ultimate resolution of cases.  Given, however, that Courthouse News is seeking here only a timely right of access to newly filed civil complaints, the Court limits its analysis to those pleadings.  Because the public's access to civil complaints plays a positive and necessary role in the courts' functioning, the Court agrees that the <u>Press-Enterprise II</u> test's logic prong is met here.  The Court further determines that: (a) Courthouse News has a qualified right of timely access, which attaches when a complaint is

submitted; (b) the right of timely access is defined in the light of historic, traditional access, so that denying access to civil complaints for more than five hours past their submission violates Courthouse News' right to timely access; and (c) a "more relaxed" form of scrutiny than strict scrutiny applies.

### A.   COURTHOUSE NEWS HAS A QUALIFIED RIGHT OF TIMELY ACCESS TO NEWLY FILED CIVIL COMPLAINTS, WHICH ATTACHES UPON SUBMISSION OF THOSE COMPLAINTS.

Although neither the Supreme Court nor the Tenth Circuit has yet held that there is a constitutional right of access to civil complaints, the Court determines that Courthouse News has a right of timely access to newly field civil complaints.  Where the "experience and logic" test is satisfied -- and, therefore, there is a First Amendment right to access -- there is a necessary "right to timely access." Courthouse News Serv. v. Planet, 947 F.3d at 594.  Although there is an absence of specific guidance from the Supreme Court or the Tenth Circuit on the scope of the right to timely access, the Court agrees generally with the Fourth and Ninth Circuits' delineations of that scope.  According to the Ninth Circuit, a right to timely access does not entitle the press to "immediate, pre-processing access to newly filed complaints." Courthouse News Serv. v. Planet, 947 F.3d at 594.   See Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021)(concluding that the First Amendment "does not require perfect or instantaneous access"). The press never had such a right; the press did not have the right or ability to take the hard copies from the clerk's hands as soon as the plaintiff handed the complaint to the clerk.  See Tr. 44:19-45:13 (Girdner).   A clerk reviewed, stamped and processed the complaint first.   The qualified right "attaches when the complaint is filed" in a traditional sense -- when it is in the court's possession -- but does "not entitle the press to immediate access to those complaints." Courthouse News Serv. v. Planet, 947 F.3d at 585.  The Ninth Circuit states:

> Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged.  After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration.  The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

Courthouse News Serv. v. Planet, 947 F.3d at 596.  The qualified right of access does "not require perfect or instantaneous access," but it does require contemporaneous access -- something in line with what the press has traditionally enjoyed.  See Press-Enterprise II., 478 U.S. at 10  Contemporaneous means that complaints filed during a day should generally be available that day.  The First Amendment requires that newly filed civil complaints be available "as expeditiously as possible."  Courthouse News Serv. v. Schaefer, 2 F.4th at 329.  Complaints filed in the morning and early afternoon should generally be available to the press before 5:00 p.m.  The great bulk of complaints should be available to the press on the day that they are filed.  That is the rule, and the exception should not swallow the rule.  As the day gets later, it may be more difficult to get the complaint filed to the press on that same day; and the press never had access to complaints filed after hours.  For those, the press must have access to those early the next day.  An "overnight delay in access to complaints filed during the last ninety minutes of the court's public hours" does not violate the First Amendment.  Courthouse News Serv. v. Planet, 947 F.3d at 599.  The Court regards these kinds of delays as "inconsequential delays."  Courthouse News Serv. v. Schaefer, 2 F.4th at 328.  This qualified right of access leaves some limited room for courts to delay access when "same-day access would be impracticable."  Courthouse News Serv. v. Schaefer, 2 F.4th at 328.

The Court agrees with the Ninth Circuit that the right of access attaches when the complaint is filed -- which in the language of the NMAOC and Tyler Technologies is when the complaint is

"submitted" by the filer.  See Courthouse News Serv. v. Planet, 947 F.3d at 585; Tr. at 77:9-81:7.

Given that the First Amendment right of access to civil complaints must be grounded in a historic

level of access under Press-Enterprise II, the Court looks to the level of access given to the press

before New Mexico courts adopted e-filing for guidance.  As the record reflects, reporters did not

have instantaneous access to newly filed civil complaints before 2012.  Reporters had access to

complaints after they had been received, reviewed, and stamped by the court clerk, and after they

were placed in a box or rack for the reporters to view.  See Tr. at 45:7-13 (Girdner).  As Girdner

testified at the PI hearing, he seeks "the same level of access that was provided before electronic

filing" Tr. at 8:19-20 (Mr. Edwards), that is: "Traditional access,"  Tr. at 8:21 (Girdner).

Girdner testified in another case that, "Traditionally, members of the press covered new

litigation in major metropolitan areas around the country by sending reporters to the courthouse

towards the end of each day to review civil complaints that had been filed that day. Trial Tr. at

35:2-10, 36:13-22 (Girdner)."  Courthouse News Serv. v. Schaefer, 440 F. Supp. 3d 532, 538 (E.D.

Va. 2020).  In Courthouse News Serv. v. Schaefer, Girdner testified further that:

> Q. When you were covering the federal courthouse in Los Angeles in the mid '80s,
> were there other reporters also covering the courts?
>
> A. There were about seven reporters. It got more crowded when there was a big
> trial, but on a day-to-day basis there were seven reporters.
>
> Q. So how did you and the other members of the press see newly filed civil litigation
> in those days?
>
> A. When I started working there, I found a tradition which was that all of us would
> troop downstairs to the clerk's office around 4:30, and we would go up to the intake
> clerk and we would ask her for the stack of new civil complaints from that day, and
> we would also check the stack of rulings and opinions for that day. And the result
> was that we book-ended the work of the court: We saw the new business on the one
> end, and we saw the conclusion, the judgments, the rulings and the opinions at the
> other end.

Transcript of Proceedings at 34:19-35:10 (Hibsher, Girdner)(Bench Trial), Volume 1, at 35, filed February 6, 2020 (Doc. 96 in <u>Courthouse News Serv. v. Schafer</u>, No. 2:18-CV-0391, (E.D. Va.)). As far as the Court can tell, reporters did not historically expect immediate access to all complaints as they were filed, but expected to view the complaints filed during the day at the end of that day. Although most of the civil complaints were processed and put in the press box on the same day, and usually within minutes, the Court understands that, when complaints were filed towards the end of the business day, they would not be available to the press box until the following business day.

Because, traditionally, reporters would not have same day access to newly filed civil complaints filed towards the close of regular business hours -- or indeed after business hours -- in the traditional system of paper filing, the Court declines to define "timely access" as access on the same day or date as filing under the new e-filing system -- at least for those complaints field late in the day or outside business hours.  The Court notes that, traditionally, clerks took no more than a minute or two to accept payment for and review complaints when they were filed manually.  <u>See</u> Tr. at 54:13-15 (Prieskop).  Similarly, under normal circumstances in New Mexico courts' e-filing system, the review process is also the work minutes.  Courts cannot use an unjustifiably lengthy bureaucratic process as an excuse to withhold access to complaints that should otherwise be made public in a timely manner.   Courts must make complaints available "'as expeditiously as possible.'"  <u>Courthouse News Serv. v. Schaefer</u>, 2 F. 4th at 328 (quoting <u>Doe v. Public Citizen</u>, 749 F.3d 246, 273 (4th Cir. 2014)).  While the Court agrees with the Fourth Circuit that neither "inconsequential delays" nor delays caused by "extraordinary circumstances" infringe the qualified right of access, the clerk cannot use bureaucratic rules or policies to justify delaying access to most complaints. <u>Courthouse News Serv. v. Schaefer</u>, 2 F.4th at 328.

**B.      THE COURT DEFINES THE OUTER LIMIT OF TIMELY ACCESS AS FIVE BUSINESS HOURS BETWEEN SUBMISSION AND ACCEPTANCE OF COMPLAINTS.**

Based on the historic access which reporters enjoyed before e-filing, as described above, the Court defines the outer limit of timely access as: access provided within five business hours of filing a complaint.   In Tyler Technologies' terminology -- adopted at the PI Hearing by the NMAOC -- a complaint must be "accepted" within five business hours of it being "submitted." See Tr. at 87:21-88:25 (Orchard).  Business hours should be calculated based on the State courts' regular working hours: the "timely access clock" would run, therefore, between 8:00 a.m. and 5:00 p.m., Monday through Friday, excluding weekends and holidays.  The Court concludes that this standard comes closest to the traditional right of access that the press had to civil complaints with the paper filing system: it takes into account the fact that most complaints filed in the morning would be available to the press at the end of the business day, around 4:30 p.m., and also the reality that complaints filed later in the day would be available only the next morning.  By defining the time access in business hours, this standard also takes into account the important interest New Mexico has in allowing complaints to be filed after business hours.  Because revoking after-hours e-filing[9] is one way other jurisdictions have tried to meet a same day or same date access requirement, see Response at 19-20, the Court is careful to note that the timely access clock does not run overnight, allowing the Defendants to preserve this important feature of e-filing.

---

[9]New Mexico courts' after-hours filing policy allows for timely filings by attorneys or self-represented litigants who may face obstacles because of unreliable internet service -- or other logistical or technical difficulties that arise from working in rural areas -- to meet filing deadlines such as statutes of limitations.  See Response at 20.

**C.  THE COURT WILL APPLY "RELAXED" OR "RIGOROUS" SCRUTINY, AND NOT STRICT OR INTERMEDIATE SCRUTINY, TO DETERMINE WHETHER THE DEFENDANTS ARE VIOLATING COURTHOUSE NEWS' RIGHT OF TIMELY ACCESS.**

While strict scrutiny applies to the outright denial of a qualified First Amendment right of access, "limitations on the right of access that resemble 'time, place and manner' restrictions on protected speech, would not be subjected to such strict scrutiny." Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 607 n. 17 (quoting Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 63, n.18 (1976)). The right of access at issue here is a qualified right and not a fundamental right, and the conduct in question is not the denial of that right, see Courthouse News Serv. v. Planet, 947 F.3d at 596, but a limitation which resembles the "time" aspect of a time, place, and manner restriction. As a result, the Court does not apply strict scrutiny, but "more relaxed scrutiny," Courthouse News Serv. v. Planet, 947 F.3d at 595. The access delay caused by the Defendants' review process, which Courthouse News challenges, does not amount to a traditional time, place and manner restriction; the traditional time, place and manner analysis is inapposite. The right at issue is not a right of access, but a right of timely access.

As the Ninth Circuit states: "Once we have determined that a qualified First Amendment right of access to newly filed nonconfidential civil complaints exists, a presumption of access arises under Press-Enterprise II that may be restricted only if closure is essential to preserve higher values and is narrowly tailored to serve those interests.'" Courthouse News Serv. v. Planet, 947 F.3d at 595 (quoting Press-Enterprise I, 464 U.S. at 510). According to the Ninth Circuit, "the Press-Enterprise II 'balancing test' is 'rigorous' but not strict, scrutiny." Courthouse News Serv. v. Planet, 947 F.3d at 596 (quoting Leigh v. Salazar, 677 F.3d 892, 900 (9th Cir. 2012). While, in Press-Enterprise II, the denial of access to transcripts was at issue, here, the challenged conduct is

not denial of access, but rather, delayed access.  The Ninth Circuit framed the <u>Press-Enterprise II</u>

test in <u>Courthouse News Service v. Planet</u> as follows: "To survive <u>Press-Enterprise II</u>'s two-prong

balancing test, Ventura County must demonstrate first that there is a 'substantial probability' that

its interest in the fair and orderly administration of justice would be impaired by immediate access,

and second, that no reasonable alternatives exist to 'adequately protect' that government interest."

<u>Courthouse News Serv. v. Planet</u>, 947 F.3d at 596.  That framing, however, assumes that the right

to timely access is a right of immediate access.  Because the right at issue is the qualified right of

timely access to newly filed civil complaints and is based on historic access, the Court reframes

the issue:

> To survive <u>Press-Enterprise II</u>'s two-prong balancing test, [New Mexico courts] must demonstrate first that there is a "substantial probability" that its interest in the fair and orderly administration of justice would be impaired by [making complaints available -- or accepted -- within four business hours of their submission], and second, that no reasonable alternatives exist to "adequately protect' that government interest."

<u>Courthouse News Serv. v. Planet</u>, 947 F.3d at 596.

Because the Court only now has defined the right of timely access in specific terms, it is

unfair to state that the Defendants have not demonstrated, either in the pleadings or at the hearing,

that making all newly filed complaints available within five business hours would impair their

interest in the fair and orderly administration of justice: indeed, the Defendants built their defense

around Courthouse News' requested pre-processing access.  Instead, the Court acknowledges that

New Mexico's interest in processing complaints falls within its interest in the "fair and orderly

administration of justice," but concludes that such an interest does not extend beyond processing

the complaint for longer than five business hours.  <u>Courthouse News v. Planet</u>, 947 F.3d at 596.

Because the Defendants offer data showing that their average processing time for initial filings

was 8.82 hours, not taking into account whether the complaint was filed after hours, the Court

concludes that the Defendants will be able to meet this test without impairing their interests.  See

Defendants' Raw Data at 32.

> **D.   BASED ON THE DATA THAT BOTH PARTIES SUBMITTED AT THE HEARING, THE COURT CONCLUDES THAT THE DEFENDANTS ARE LIKELY VIOLATING COURTHOUSE NEWS' RIGHT OF TIMELY ACCESS.**

Courthouse News has shown that it is likely to succeed on the merits of its claim that the

Defendants are violating Courthouse News' right of timely access to newly filed civil complaints,

defined here as the right to access complaints within five business hours of their submission.

Neither Courthouse News' nor the Defendants' data broke down the amount of time between the

submission and acceptance of a complaint in business hours.  The Court notes, however, that the

Defendants' Raw Data spreadsheet shows a date and time stamp for both the submission and the

acceptance of a complaint; based on this information, the Defendants' spreadsheet calculated the

number of minutes and hours which elapsed between submission and acceptance of each

complaint, but in calculating this elapsed time, the Defendants' spreadsheet did not account

for -- specifically, did not deduct -- any hours and minutes that elapsed outside of regular business

hours.  See Defendants' Raw Data at 1.  As a result, the Court cannot determine the extent to which

the Defendants are violating Courthouse News' right of timely access.  However, spot checks the

Court performed of the data demonstrate that, while in the vast majority of these cases, the

Defendants have been within the five-business-hour limit of timely access, there are be instances

where, even deducting time elapsed outside business hours, the Defendants delayed processing of

the complaints beyond five business hours.  See Findings of Fact 76-79.

III.   **THE COURT WILL DENY COURTHOUSE NEWS' REQUEST FOR AN INJUNCTION REQUIRING PRE-PROCESSING ACCESS TO ALL COMPLAINTS, BUT WILL GRANT ITS REQUEST FOR AN INJUNCTION REQUIRING TIMELY ACCESS TO COMPLAINTS, AS DEFINED BY HISTORY AND EXPERIENCE TO BE WITHIN FIVE BUSINESS HOURS.**

The Court denies the injunctive relief that Courthouse News seeks, which would direct New Mexico to implement immediate, pre-processing access to newly filed civil complaints, but grants Courthouse News' injunction requesting timely access, defined as access to complaints within five business hours of their submission.  To be successful in its motion for a PI, Courthouse News must make four showings: (i) that Courthouse News is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to Courthouse News if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause" the New Mexico court system; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992).  "[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'" Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal quotation marks omitted)(quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal, 546 U.S. 418

(2006)("O Centro II")).  Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir.

2009).  Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"  Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979).  The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *40.  When evaluating whether the

issuance of a requested injunction would alter the status quo between the parties, the Court should

look at "the reality of the existing status and relationships between the parties, regardless of

whether the existing status and relationships may ultimately be found to be in accord or not in

accord with the parties' legal rights."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100

(10th Cir. 1991), overruled on other grounds by O Centro II, 389 F.3d at 975.  "The meaning of

this category is self-evident."  Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41.  With

respect to preliminary injunctions that will change the status quo, "the movant has an even heavier

burden of showing that the four factors listed above weigh heavily and compellingly in movant's

favor before such an injunction can be issued."  Salt Lake Tribune Publ'g Co. v. AT & T Corp.,

320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc.

v. Visa USA, Inc., 936 F.2d at 1098-99).

First, the Court concludes that neither Courthouse News -- nor the public in general -- will

suffer irreparable injury if it does not issue an injunction requiring New Mexico courts to make

newly filed -- or submitted -- complaints available before they are processed -- or accepted.  As

discussed above, the right of timely access to civil complaints is a qualified one, and it is one that history and experience both defines and determines.  The history and experience of news reporting show that the press had access to newly filed civil complaints after they were processed, and that this access was generally same-day access, but it was often the next day if the complaints were filed later in the day.  Because there was no historic right of access to complaints before they were processed by the clerk, failing to enjoin the Defendants to give pre-processing access to complaints does not create constitutional injury.  Because the Supreme Court defines the First Amendment right of timely access in terms of "experience and logic," the loss of something they did not have cannot injure the press or the public.  See Press-Enterprise II, 478 U.S. at 10.  On the other hand, Courthouse News has shown that it is likely to suffer irreparable injury unless the Court enjoins the Defendants from withholding complaints beyond the number of hours which history and experience demonstrate is timely.  Because the Court takes into account the litigants' ability to file outside business hours, it determines that timely access can be measured as access within five business hours of the submission of a complaint.  Because the Court determines that it is likely that Courthouse News will succeed on the merits of its timely -- but not immediate or pre-processing -- access claim, "irreparable injury is presumed" in a First Amendment case.  Heideman v. South Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003)).

Second, the threatened injury of having news of civil complaints delayed by a few minutes or hours does not outweigh the damage and disruption that an injunction to provide instant access would create.  Requiring the New Mexico courts to change their systems overnight would cause significant disruption to the courts.  If New Mexico courts must implement a system that makes civil complaints available more timely, it must be allowed to do so in a way that enables a smooth and efficient transition, and allows it to procure the resources that it needs to make this change.

Third, the Court acknowledges that instant, pre-processing access to civil complaints may serve the public interest, but the inadvertent disclosure of confidential information that may result from a change to pre-processing access does not serve the public when the legal community in New Mexico potentially has come to rely on the ministerial checks the clerks perform.  On the other hand, an injunction requiring timely access within five business hours would not be adverse to the public interest, because the clerks would continue to process complaints and ensure that they contain no inadvertent confidential information.

Finally, Courthouse News has not shown that it will succeed on the merits of requiring immediate, pre-processing access to newly filed civil complaints: such a right was not part of the First Amendment, nor can it be found in the experience of news reporting.  Unlike its request for pre-processing access, Courthouse News likely will likely succeed on the merits in seeking timely access to newly filed civil complaints, as experience shows to be generally same-day, with an outer limit of five business hours between the submission and acceptance of a complaint.  The Court is mindful that "the limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'"  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  While the Tenth Circuit has stated that mandatory preliminary injunctions that "alter the status quo" are disfavored preliminary injunctions, here, the Court's limited injunction will not change the status quo, if the Defendants' data is accurate.  Similarly, because the Defendants may not be far from meeting the right to timely access standard that the Court concludes that the First Amendment requires, and because they already have all of the systems in place, the injunction does not compel any extra activity on their part, but rather prohibits the withholding of civil complaints beyond what the Court concludes the First Amendment right requires -- a five-business-hour limit.

**IV.**    **THE COURT WILL NOT REQUIRE COURTHOUSE NEWS TO SECURE A BOND.**

The Court will not require Courthouse News to secure a bond.  Under rule 65(c), the Court may secure a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States, and its officers and agencies, are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable").  See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Defendants request a "sizeable bond" from Courthouse News to pay for "the installation, use, and maintenance of a press-review tool, and increase its staff resources."  Response, at 23.  In light of the determination that the Defendants are violating Courthouse News' First Amendment rights, the Court concludes that the Defendants are not required to secure a bond to ensure that the State of New Mexico complies with the Constitution.  See Goyette v. City of Minneapolis, 338 F.R.D. 109, 121 (D. Minn. 2021)("Courts have concluded that a bond is not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment.").  Moreover, while the Defendants have indicated that the press-review tool will cost $108,000.000, there is also some evidence that it will cost nothing.

The Court finds by a preponderance of evidence that the addition of Tyler Technologies' Press Review Queue will not cost the Defendants anything to purchase.  In any event, the Court is not mandating that the State use or purchase that software.  The Court's injunction is more modest, saying that the State must make non-confidential civil complaints available to the press more consistently in a contemporaneous manner.  The State remains free to decide how to speed up that process.  Further, the Defendants have not quantified the cost of an increase in staff resources.  The parties have not presented the Court with much, if any, concrete information regarding the cost of any potential adaptations.  See Requirement of Security for the Issuance of a Preliminary Injunction or Temporary Restraining Order, 11A Fed. Prac. & Proc. Civ. § 2954 n. 48 (3d ed.)("The district court cannot simply set an injunction bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that the reviewing court can determine whether the number was within a range of options from which one could expect a reasonable trial judge to select.")(citing Starsurgical, Inc. v. Aperta, LLC, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011)(Adelman, J.)).  Indeed, it may be the case that the Defendants do not need to install new software or hire new staff to comply with the Court's injunction.  Accordingly, the Court will not require Courthouse News to secure a bond.

IT IS ORDERED that: (i) Plaintiff Courthouse News Service's Motion for Preliminary Injunction, filed July 30, 2021 (Doc. 2)("PI Motion") is granted in part and denied in part; (ii) the Defendants are enjoined from withholding press access to newly filed non-confidential civil complaints for longer than five business hours; and (iii) the PI Motion is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gregory P. Williams
Peifer, Hanson, Mullins & Baker, P.A
Albuquerque, New Mexico

-- and --

John K. Edwards
Jackson Walker
Houston, Texas

-- and --

Patrick J. Rogers
Patrick J. Rogers, LLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Erin Elizabeth Lecocq
  Assistant Attorney General
Nicholas McDonald
New Mexico Office of the Attorney General

    *Attorneys for the Defendants*